## CHESAPEAKE BAY FOUNDATION, et al.

v.

## BETHLEHEM STEEL CORPORATION.

### Civ. No. Y–84–1620.

United States District Court,
D. Maryland.

May 6, 1985.

James Thorton, Esquire, New York City, and Scott Burns, Annapolis, Md., for plaintiffs.

Benjamin Rosenberg, G. Stewart Webb, Jr., and Jack L. Harvey, Baltimore, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Plaintiffs, Chesapeake Bay Foundation ("CBF") and the Natural Resources Defense Council ("NRDC"), have filed suit against the defendant, Bethlehem Steel Corporation, for allegedly violating the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("the Act"), specifically, Sections 301 and 402 of the Act, 33 U.S.C. §§ 1311, 1342. The Act establishes a system to limit the kind and quantity of pollutants which may be discharged into the navigable waters of the United States. The Act also provides for a system of monitoring by those who discharge pollutants under permits issued pursuant to the Act.

The Chesapeake Bay Foundation is a membership organization dedicated to preserving and restoring the environment of the Chesapeake Bay and educating the public about the Bay. The Natural Resources Defense Council is a national organization with the claimed goal of joining legal expertise with scientific knowledge to safeguard America's natural resources and protect public health. The Bethlehem Steel Corporation operates a steelmaking plant in Sparrows Point, Maryland under state and local permits, issued pursuant to the Act, limiting discharges into the Patapsco River, Bear Creek, Jones Creek, and Old Road Bay, all of which empty into Baltimore Harbor. Plaintiffs allege that defendant has violated the terms of those permits.

Both plaintiffs have brought this suit under the citizen suit provision of the Act, 33 U.S.C. § 1365(a).

That provision provides, in part,

Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf,

(1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this Act

\* \* \* \* \* \*

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under Section 309(d) of this Act.

For purposes of standing under Section 505, 33 U.S.C. § 1365, a citizen is a "person or persons having an interest which is or may be adversely affected." Section 505(g), 33 U.S.C. § 1365(g). Both plaintiffs claim standing in their own right and as representatives of their members who are or may be adversely affected.

Plaintiffs' motion for partial summary judgment on the issue of liability is now ripe for resolution. Plaintiffs seek a declaratory judgment that the defendant has violated the Act by exceeding the terms of

its permit and argue that the defendant's own reports, submitted to state and federal authorities as required by the Act, establish conclusively the numerous permit violations which have occurred, and that summary judgment is appropriate. Defendant has countered by claiming that the plaintiffs lack standing to bring this suit and that most of the alleged violations occurred outside of the applicable statute of limitations. Defendant also argues that the monitoring reports submitted to state and local authorities are not conclusive on the issue of whether there has been a permit violation.

Before proceeding to a determination of these substantive issues, it is necessary to outline the statutory scheme on which the claims are based.

In 1972, Congress enacted the Federal Water Pollution Control Act. Its goal was to eliminate by 1985 the discharge of pollution into the nation's waterways. To achieve that goal, Congress determined that industrial and municipal discharges should be regulated by permits. A National Pollutant Discharge Elimination System ("NPDES") permit, issued under the Act, limits the kind and quantity of pollutants an industrial or municipal discharger may emit into the navigable waters of the United States. The permits should be designed to reflect the technological feasibility of particular methods of reducing pollution. The discharge of any pollutant is unlawful unless the discharger first obtains a permit and complies with its terms. Section 301(a), 33 U.S.C. § 1311(a) makes unlawful the "discharge of any pollutant by any person" except in compliance with numerous provisions of the Act, including § 402 which established the NPDES. *See EPA v. State Water Resources Control Board,* 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976).

In addition to limitations on discharges, called effluent limitations, all NPDES permits contain monitoring and reporting obligations designed to make the permits enforceable. Under § 308, 33 U.S.C. § 1318, the Administrator of the Environmental Protection Agency must require that permit holders install monitoring equipment, that they sample and monitor effluent, and that they keep records of the results and report such results as required. These reports, called Discharge Monitoring Reports ("DMRs"), are specified in 40 C.F.R. 122.-41, and must be filed by the holder of each federal—or state—issued NPDES permit. Such reports are usually public information, unless reported information is entitled to protection as a trade secret. 33 U.S.C. § 1318(b).

The Act also provides a mechanism for delegating permit writing and program control to state governments. Under Section 402(b), 33 U.S.C. § 1342(b), the Administrator is to approve and authorize a state program that meets certain criteria. State programs must, for example, enforce effluent limits at least as strict as federal effluent limits. Section 402 encourages states to enforce stricter standards. States must also require that permit holders file DMRs. The State of Maryland's NPDES program was approved and authorized by the Administrator on September 5, 1974.

The obligations and limitations of NPDES permits are binding unless timely challenged, and may not be reexamined in an enforcement proceeding. The terms of a permit issued by EPA "shall not be subject to judicial review in any civil or criminal proceeding for enforcement." Section 509(b)(2), 33 U.S.C. § 1369(b)(2). Maryland law contains a parallel provision. Under Maryland law, a permit holder may challenge a permit's terms and conditions only during the 15 day period after a notice of informational hearing on the proposed permit is published. XI COMAR § 10.50.03.-02A.

Finally, when state and federal governments have failed to enforce a permit, the Act grants any citizen who has an "interest which is or may be affected" the right to step into the shoes of the government and enforce the permit. Section 505(g), 33 U.S.C. § 1365(g). The citizen may seek a declaration of liability, an order requiring compliance, civil penalties payable to the

United States Treasury, and costs including attorneys' fees. Sections 505, 309, 33 U.S.C. §§ 1365, 1319. The Act's citizen suit provision is modeled on the citizen suit provision in the Clean Air Act. *See* S.Rep. No. 92–414, 92d Cong. 1st Sess. 79 (1971), reprinted in U.S.Code Cong.Ad.News, p. 3668. *Friends of the Earth v. Carey,* 535 F.2d 165, 172–74 (2d Cir.1976).

The first inquiry for this Court on the present motion requires resolution of the standing of plaintiffs to bring this action.

### STANDING

■ Section 505(a) provides that any "citizen" may commence a civil action to enforce a permit limitation, and Section 505(g) provides that a citizen is a person or persons having an interest which is or may be adversely affected. 33 U.S.C. § 1365(g). According to the Supreme Court, this phrase "was intended by Congress to allow suits by all persons possessing standing under ... *Sierra Club v. Morton,* 405 U.S. 727 [92 S.Ct. 1361, 31 L.Ed.2d 636] (1972)." *Middlesex County Sewage Authority v. Sea Clammers,* 453 U.S. 1, 16, 101 S.Ct. 2615, 2624, 69 L.Ed.2d 435 (1981). This section was intended to confer standing to the limit that Article III of the Constitution allows. *See Montgomery Environmental Coalition v. Costle,* 646 F.2d 568, 576–78 (D.C.Cir.1980). Plaintiffs argue that they have shown sufficient interest and injury to establish standing, both as organizations and as representatives of their members. Defendant asserts, however, that plaintiffs have failed to establish facts sufficient to meet the constitutional threshold for standing. Proof of some injury that has resulted from the putatively illegal conduct of the defendant is, according to the Supreme Court, the "irreducible minimum" required for standing under Article III. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

Plaintiffs' claim to standing is based on a variety of factors. Plaintiff Chesapeake Bay Foundation is an organization dedicated to preserving and restoring the environment of the Chesapeake Bay. It employs workers in and around the Patapsco River and those workers are allegedly affected by water quality conditions in the vicinity of Bethlehem's plant. Bethlehem's alleged noncompliance with its NPDES permit may contribute to those water quality conditions. CBF also purports to have brought suit on behalf of its members and has named three of those members and submitted affidavits from them. Those affidavits show that at least three CBF members are residents of Maryland and claim that they use and enjoy the Patapsco River and the water system of which it is a part. It is alleged that those three members have recreational, aesthetic and environmental interests that are being, and will be, affected by defendant's discharges in the area. Plaintiff NRDC also sues on its own behalf and on behalf of its members, but it has declined to publicly name those members. NRDC members who are adversely affected by discharges into the Chesapeake Bay were named in sealed documents submitted along with NRDC's request for an order protecting their identities.

■ Plaintiff CBF has established the requisite standing to allow it to bring this suit. The Supreme Court has enunciated three requisites to establish standing: (a) the party who invokes the court's authority must show that he personally has suffered some actual or threatened injury as a result of the allegedly illegal conduct of the defendant, he cannot sue for a third party; (b) the injury must be fairly traceable to the challenged action, and (c) be likely to be redressed by a favorable decision of the Court. *Valley Forge Christian College* at 472, 102 S.Ct. at 758. By imposing these requirements, the court can ensure that the suing party has sufficient interest or personal stake to furnish the necessary concreteness to present a "case or controversy." *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

■ However, the plaintiff is an organization which purports to sue on behalf of its members, the court must examine

some additional factors. An organization may sue on behalf of its members if: (1) its members would otherwise have standing to sue in their own right, (2) the interests the organization seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review. *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). In this case, the interests that CBF seeks to protect are directly related to its purpose, and because the plaintiffs ask for recovery in the form of statutory penalties paid directly into the United States Treasury, there is no need for individual members to actively participate in this suit. The only real question, then, is whether CBF's members have suffered sufficient injury in fact to entitle them to pursue this suit.

The three members of CBF who have submitted affidavits have indicated that they use and enjoy the Patapsco River and other areas of the Chesapeake Bay water system. CBF itself is a regional environmental organization with many members who are residents of Maryland. Undoubtedly, many more than the three named individuals use and enjoy the Chesapeake Bay, but CBF has chosen to name only three in support of its claim to representational standing. There is no question that those three members have shown sufficient injury in fact to show standing in this action. Therefore, CBF may proceed in this action as representative of those members.

■ CBF members have alleged that they have recreational and aesthetic interests that may be harmed by the pollution of the Chesapeake Bay. They have affirmed that they are residents of Maryland and that they use and enjoy the Chesapeake water system in the area of defendant's discharge. Standing under the Clean Water Act may inhere in citizens who have an interest that is or may be affected, which can be demonstrated by showing a connection with the geographical area that is the subject of the suit, *Student Public Interest Group v. Monsanto Co.*, 600 F.Supp. 1479, 1484 (D.N.J.1985). *See also Montgomery Environmental Coalition v. Costle*, 646 F.2d 568, 576–78 (D.C.Cir.1980). In addition to a mere geographical connection, plaintiff's members have stated that they have suffered and will suffer injury to aesthetic and recreational interests due to Bethlehem's continued discharges in excess of permit limits.

■ The Supreme Court has acknowledged that harm to one's aesthetic or recreational interest is sufficient to establish standing to sue. "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society...." *Sierra Club*, 405 U.S. at 734, 92 S.Ct. at 1366. In *Sierra Club*, the Court noted:

> the alleged injury will be felt only by those who use [the area in question] and for whom the aesthetic and recreational values of the area will be lessened by the highway and ski resort. The Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the Disney development. Nowhere in the pleadings or affidavits did the Club state that its members use [the area] for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents.

*Sierra Club*, 405 U.S. at 735, 92 S.Ct. at 1366. The Court concluded that the Sierra Club did not have standing under those circumstances.

Here, the individual members have alleged health, aesthetic and recreational interests. They have also alleged that they use the Patapsco River and the bay area, and that their use would be affected by the continued pollution of the area. These assertions are supported by affidavit. Defendant has not disputed the truth of these assertions, but has claimed that these inter-

ests and this inquiry is not enough. It is clear that under *Sierra Club* and its progeny, the injury which plaintiff asserts is sufficient to guarantee standing. *See Student Public Interest Research Group v. Monsanto, supra,* at 1484.

Nor is it necessary for the plaintiff to demonstrate that the claimed injury is directly traceable to specific discharges by the defendant. It would be nearly impossible for the plaintiff to make such a showing. As noted in an unpublished opinion, *see Student Public Interest Group v. Tenneco Polymers, Inc.,* 602 F.Supp. 1394, 1397 (D.N.J.1985):

> Obviously, the pollution of a portion of a major, interstate waterway ... is caused by a combination of discharges from many different sources. The effect of the defendant's argument would be to prohibit any citizen' suits against violators of the FWPCA unless the violation was so great or the waterway so small that the direct impact of the discharges could be pinpointed. This interpretation of the FWPCA would be directly contrary to its intent.

That reasoning seems correct and applies with equal force in the instant case. Bethlehem discharges at various points into the Patapsco River and other bodies of water, and plaintiffs have asserted that their activities near those points of discharge are affected. To require a particularized showing that a certain discharge caused a specific injury to one of plaintiff's members would unduly burden the plaintiff and virtually emasculate the citizen's suit provision by making it impossible for any plaintiff to demonstrate standing. It is sufficient in this case that the CBF has demonstrated that it has at least three members who are affected by pollution in the area of defendant's discharge.

■ Accordingly, CBF has standing to pursue this action for judicial review of permit violations. The decision is not so clear with regard to the plaintiff NRDC. NRDC is a national, not a regional, organization dedicated to pursuing legal actions against many sorts of environmental violations. It has no geographical or philosophical ties to the Maryland area or the Chesapeake Bay, and it has declined to publicly name any of its members who are affected by defendant's actions in the Patapsco River area. NRDC erroneously claims that it has standing to pursue this action in its own right.

NRDC does have standing, however, to pursue this action as a representative of some of its members. NRDC has identified certain of its members to the Court who live in the area of defendant's discharges and who use the waterways in question. It does not oppose the release of these names to the defendant's counsel, although it has requested that those members' names not be released publicly. In its attempting to represent those members' interest in this lawsuit, NRDC has also submitted the affidavit of William C. Baker, a member of NRDC since 1983, who affirms that he enjoys boating on the Chesapeake Bay and often travels into Baltimore Harbor and the Patapsco River. Mr. Baker also asserts that his interest in the Bay as a recreational, environmental and aesthetic asset is harmed by Bethlehem's failure to comply with its NPDES permit. Thus, at least some NRDC members would have individual standing to sue in this action.

NRDC also meets the other requirements for representational standing. The interests it seeks to protect are germane to its purpose, and it is not necessary for individual members of NRDC to participate in the action for any reason. Although the NRDC's connection to the Chesapeake Bay is not as close as that of the CBF, this Court concludes that the NRDC has the requisite standing to pursue this action.

## STATUTE OF LIMITATIONS

Defendant has also asserted that the plaintiffs' motion for summary judgment must be denied because many of the acts complained of occurred outside of the applicable statute of limitations. In their complaint, plaintiffs allege 369 violations of the Act occurring between January of 1978 and

January of 1983. Defendant argues that the applicable statute of limitations bars plaintiffs from seeking relief for any of the violations alleged to have occurred more than one year prior to plaintiffs' filing of their complaint.

■ The Act does not provide any limitations period for actions instituted pursuant to its provisions. Generally, in the absence of a limitations provision specified by a particular federal statute, a federal court should apply the period of limitations most appropriate under state law, unless an "otherwise appropriate" federal statute of limitations applies. *Johnson v. Railway Express Agency*, 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1974). Federal courts have not hesitated to apply the most appropriate state statute where Congress has failed to provide a limitations period specifically applicable to a cause of action under federal law. *See, e.g., Runyon v. McCrary*, 427 U.S. 160, 180, 96 S.Ct. 2586, 2599, 49 L.Ed.2d 415 (1976); *Auto Workers v. Hoosier Corp.*, 383 U.S. 696, 703–05, 86 S.Ct. 1107, 1112–13, 16 L.Ed.2d 192 (1966).

Congress did not provide a limitations period for causes of action asserted under the Clean Water Act, and defendant has argued that the most appropriate state statute should therefore be applied. The statute that defendant wishes to apply is the one set forth in Section 5–107 of the Courts and Judiciary Article of the Maryland Code, which provides a one-year limitations period in a suit for a penalty. Defendant asks this Court to conclude that the plaintiffs are suing for a penalty, which the defendant defines as an amount "which an individual is allowed to recover against a wrongdoer, as a satisfaction for the wrong or injury suffered, and without reference to the actual damage sustained," *citing Nordling v. Johnson*, 205 Or. 315, 283 P.2d 994, 998 (1955). While the Court does not necessarily agree that this action is a suit for a penalty under that definition, (in this action an individual does not recover the penalty, which is paid into the United States Treasury), there is no need to decide whether that section of the Maryland Code

applies because no state statute of limitations should apply in this instance.

Where reliance on a state statute would frustrate a federal policy, the general rule concerning the application of an appropriate state statute of limitations should not apply. As the Supreme Court noted in *Occidental Life Insurance Co. v. Equal Employment Opportunity Commission*, 432 U.S. 355, 367, 97 S.Ct. 2447, 2455, 53 L.Ed.2d 402 (1977):

The Court has not mechanically applied a state statute of limitations simply because a limitations period is absent from the federal statute. State legislatures do not devise their limitations periods with national interests in mind, and it is the duty of the federal courts to assure that the importation of state law will not frustrate or interfere with the implementation of national policies.... State limitations periods will not be borrowed if their application would be inconsistent with the underlying policies of the federal statute.

■ The application of a one-year statute of limitations in the instant case would frustrate several policies of the Act. The application of a state statute of limitations would produce non-uniform citizen suit enforcement from state to state. In the context of the Clean Water Act, it could not have been the intent of Congress to have the federal courts borrow state statutes of limitations and certainly not statutes as short as one year. If courts were to borrow state statutes of limitations the enforcement of the Act would vary from state to state. Some states could choose to have a very brief statute of limitations, and thus be very hospitable to industries that violate the Act, while others could adjust their limitations periods to provide a more hostile attitude towards possible polluters. By simply adjusting their statutes of limitations, states could frustrate the aims of the NPDES program. *See Tenneco Polymers*, 602 F.Supp. at 1399. Inherent in the notion of state NPDES programs is the idea that state standards and enforcement will be at least as strict as under the federal pro-

gram. While the Act contemplates encouraging states to enforce more stringent permit requirements than the federal government, a state, by adopting a very short statute of limitations, could make permit violators nearly immune to the prosecution of citizen suits. Congress adopted the citizen suit provision with the intent that such a provision would aid in the enforcement of NPDES permits and could not have meant that enforcement could be so capricious.

The application of a state statute of limitations would also produce non-uniform enforcement as between citizens and the government. It seems that Congress, including the citizen suit as one method of enforcing the Act, intended that citizen and government actions would be parallel. "[S]tandards for which enforcement or through citizen enforcement procedures are the same. Therefore, the participation of citizens in the courts seeking enforcement of water pollution requirements should not result in inconsistent policy." S.Rep. No. 92–414, 92d Cong. 2d Sess., *reprinted in* U.S.Code Cong.Ad.News 3668, 3746. While this passage does not refer to statutes of limitations specifically, it seems in keeping with the legislative intent exhibited that enforcement of the Act should be governed by a uniform statute of limitations throughout the United States.

Proceedings initiated by the EPA would almost certainly be subject to a five-year statute of limitations, 28 U.S.C. § 2462, and the limitations period for citizen enforcement should not be shorter. 28 U.S.C. § 2462 has been applied in suits for the recovery of penalties by the government under the environmental laws, *see, e.g., United States v. Central Soya, Inc.,* 697 F.2d 165, 169 (7th Cir.1982) (Rivers and Harbors Act); *United States v. C & R Trucking Co.,* 537 F.Supp. 1080, 1083 (N.D. W.Va.1982) (Clean Water Act). Plaintiffs in this action have brought suit as private attorneys generals and seek the same relief as would the government.

Enforcement of the Act through citizen suits is appropriate only after the EPA and the state have had an opportunity to enforce the Act. It would defeat the purpose of the Act to impose a shorter statute of limitations on citizen suits than on federal or state agencies. As the First Circuit noted in *Commonwealth of Massachusetts v. United States Veterans' Administration,* 541 F.2d 119 (1st Cir.1976), "the citizens' suit provision of this section [33 U.S.C. § 1365] were designed to supplement and expedite administrative action to abate violations of this chapter; recourse to the courts is appropriate only when the administrative action taken is less than adequate." *See also Save Our Sound Fisheries Association v. Callaway,* 429 F.Supp. 1136, 1142 (D.R.I.1977), in which the court noted:

Two major Congressional concerns regarding citizen suits stand out from the legislative history of §§ 1365 and 1415(g). First, Congress thought it vital to supplement administrative enforcement of the statutes with enforcement by citizen suits. Second, Congress put strong reliance on administrative enforcement, generally allowing citizen enforcement only after the Administrator had an opportunity to bring his powers of enforcement to bear on the polluter.

In that case, the court was referring to the requirement that a citizen notify the potential defendant and the EPA 60 days before suit thus giving the EPA the opportunity to institute enforcement procedures. The same reasoning would seem to apply here. A citizen has no opportunity to determine whether the EPA administrative enforcement procedures are adequate until the limitations period for the EPA has nearly passed.

The effect of enforcing a one-year statute of limitations would be to force citizens to give notice almost immediately after a particular incident of non-compliance had occurred. The EPA, on the other hand, may choose to seek penalties only from those who violate permit limitations regularly or over a period of time. The EPA is given a five-year period in which to determine whether a company consistently vio-

lates the Act and to seek penalties from the worst offenders. Subjecting citizen suits to a much shorter period of limitations would interfere with the EPA's enforcement decisions by forcing the EPA to either take action within 60 days of a citizen notice or forego action in favor of a citizen suit. Furthermore, it would be nearly impossible for a citizen to determine whether the EPA's enforcement had been adequate without allowing the EPA adequate time to decide how to allocate its resources in the prosecution of alleged offenders.

It is important, then, that the statute of limitations for citizen suits be at least as long as that for administrative action. The question of what statute of limitations to apply in a citizen suit under the Act was recently decided in *Student Public Interest Research Group, supra,* at 1398. That court, in an unpublished opinion, also rejected the defendant's argument that a state statute of limitations should apply, noting that a citizen should have at least as long as the government to bring an enforcement action for many of the reasons noted above. *See also Monsanto, supra,* at 1477. The court in that case also rejected the argument that the applicable federal statute of limitations should apply, with the result that no statute of limitations applied. Although this Court may agree with the reasoning of the New Jersey court, it cannot agree that there is no statute of limitations applicable to this action.

Although there is no precedent for applying the statute of limitations applicable to government actions for civil penalties to a citizen suit, 28 U.S.C. § 2462, is the most appropriate statute of limitations to be applied in this action.

That statute provides:

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

The statute is usually held to be "primarily, if not exclusively, designed for use in suits brought by the Government." *Payne v. A.O. Smith Corp.,* 578 F.Supp. 733 (S.D. Ohio 1983). In *Bertha Building Corp. v. National Theaters Corp.,* 269 F.2d 785 (2d Cir.1959), *cert. denied,* 361 U.S. 960, 80 S.Ct. 585, 4 L.Ed.2d 542 (1960), the Second Circuit held that 28 U.S.C. § 2462 applied only to actions asserted on behalf of the United States and to *qui tam* actions. However, the present suit is of an unusual nature and there are circumstances which make it appropriate to apply this statute to a suit of this sort.

This action has many of the attributes of a *qui tam* action, although in light of the wording of the Act and its citizen suit provision this action cannot technically be classified as a *qui tam* suit. A *qui tam* action is one brought by an informer or volunteer for violation of a particular civil or criminal statute which provides that the suing party, if successful, may recover a share of the penalty with the remainder going to the State or other government institution. Black's Law Dictionary at 1126 (Fifth Ed.1979); *Sierra Club v. Andrus,* 610 F.2d 581, 591 (9th Cir.1980). In this action, according to the statute, the citizen sues "on his own behalf," and the citizen "volunteer" cannot recover a share of the penalty. That penalty is paid to the United States.

The reasons for applying a federal statute of limitations are as strong in this action, however, as in a *qui tam* action. The plaintiffs are suing as private attorneys general, and they seek the enforcement of federal law. Although the statute provides that a citizen sues "on his own behalf," any penalties recovered from such an action are paid into the United States Treasury. Unlike in a *qui tam* action, where a volunteer plaintiff can recover part of the penalty, in this action a plaintiff recovers nothing. Any benefit from the lawsuit, whether injunctive or monetary, inures to the public or to the United States.

The citizen suit provision was designed to supplement administrative enforcement, not to provide a private remedy. Under these circumstances it seems most appropriate that the same statute of limitations applies to a citizen action as to a federal administrative action.

Therefore, the five year limitations period set out in 28 U.S.C. § 2462 will be applied in this action.*

### NOTICE

■ Section 505 of the Act provides that at least 60-days' advance notice of an alleged violation of a permit limitation must be given to (i) the Administrator of the EPA, (ii) the State in which the violation occurred, and (iii) the alleged violator. § 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A). The EPA has promulgated regulations governing the form, content and service of citizens' notices under the Act. 40 C.F.R. § 135 (1983). Pursuant to these regulations, a defendant must be given 60 days' notice of alleged violation before suit may be brought in the district court.

Bethlehem alleges that in the instant action plaintiffs have failed to give the requisite notice of the violations listed in Exhibit B to the complaint. Those violations were reported after the plaintiffs sent the required notice letter to the defendant, but before suit was brought. Thus, the formal statutory notice was not given for the violations that allegedly occurred within that 60-day period.

Section 505(b)(1) provides that no action shall be commenced under the Act prior to sixty days after the plaintiff has given notice of the alleged violation. While it has been held that the notice requirement is jurisdictional and therefore cannot be ignored by the court, *see Save Our Sound*

*Fisheries Association v. Callaway, supra,* courts have adopted a pragmatic approach to this statutory requirement. Thus, the Third Circuit in *Susquehanna Valley Alliance v. Three Mile Island,* 619 F.2d 231 (3d Cir.1980), held that dismissal and refiling of premature suits was not necessary where the required statutory notice was not given, as long as it appeared that the defendant and the regulatory agencies involved had had actual notice for more than sixty days at the time the district court acted. Accord, *Pymatuning Water Shed Citizens for a Hygienic Environment v. Eaton,* 644 F.2d 995 (3d Cir.1981).

■ Taking a pragmatic view of this case leads to the conclusion that the notice given by the plaintiffs was sufficient to satisfy the jurisdictional requirement of § 505(b). Congress clearly intended that the citizens' suit provision of the Act be available for continuing violations. Congress stressed that "a citizen has a right under Section 505 to bring an action for an appropriate remedy in the case of any person who is alleged to be, or to have been, in violation, whether the violation be a continuous one, or an occasional or sporadic one." H.R.Rep. No. 92–911, 92d Cong. 2d Sess., *reprinted in* 1 Legislative History of the Water Pollution Control Act Amendments of 1972 at 179 (1973). It would be incongruous with this right to sue for a continuing violation to conclude that specific incidents of non-compliance within the sixty day notice period could not be sued upon because of a lack of statutory notice.

Defendant cannot claim that it lacked actual notice of its own violations, reported in its own records filed after the sixty day notice was given. The notice requirement is designed to afford the EPA or state regulatory agency an opportunity to pass

---

* As the defendant has noted, even when a five-year statute of limitations is applied, certain of the claims set forth in Exhibit A to plaintiffs' complaint are time barred. A–6 through A–8, B–1 through B–6, C–1, D–2, E–24 through E–35, G–40 through G–49, I–8 through I–12, J–20 through J–23, K–4, L–4, M–28 through M–36, S–36 through S–42, T–4, Y–1, Z–11 through Z–12, AA–1 through AA–4, AB–1, AC–1 through

AC–7, AG–1 through AG–7, AH–1 through AH–3, AI–1, AJ–13 through AJ–15, AK–15 through AK–17, AM–2, AN–3, AO–14 through AO–15, AP–14 through AP–16. In addition, violations alleged in Exhibit A at P–2, Q–3, S–35 and AJ–12, daily violations alleged for April of 1979, may also be barred. Thus, even with a five year statute of limitations, up to 104 of the claims alleged by plaintiffs may be barred.

upon the claims of alleged violations prior to a citizens' suit to enforce permit limitations, *see Susquehanna Valley Alliance, supra,* at 243, *Commonwealth of Massachusetts v. United States Veterans' Administration,* 541 F.2d 119, 121 (1st Cir. 1976), in the hope that increased administrative attention could bring about compliance. It is not meant to provide defendants with a formalistic defense to a claim of continuing violation.

Plaintiffs' notice in this case was continuing notice that the defendant was in violation of the Act. As both the defendants and the regulators were aware that Bethlehem remained in violation of the Act by continuing to discharge in excess of permit limitations, and reported those discharges in its own reports, the requisite statutory notice was given with respect to violations listed in Exhibit B of the complaint.

## LIABILITY

Plaintiffs seek summary judgment on the issue of liability and argue that defendant's own reports and records, the DMRs submitted by the defendant, establish that Bethlehem has exceeded its permit limitations on a number of occasions, and that those reports are conclusive on the issue of liability. Defendant claims that its DMRs are not the original records of incidents of non-compliance and that DMRs should not be conclusive on the issue of liability.

■ Section 301(a) of the Act, 33 U.S.C. § 1311(a), makes unlawful any discharge not authorized by one of several specified sections of the Act. One of those sections, Section 402(k), 33 U.S.C. § 1342(k), provides:

> Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 309 [EPA enforcement and civil penalties] and 505 [citizen suits], with section 301....

Thus, without more, to violate a NPDES permit is to violate the Act. *Environmental Protection Agency v. State Water Resources Control Board,* 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976);

*Natural Resources Defense Council, Inc. v. Costle,* 568 F.2d 1369, 1374–77 (D.C.Cir. 1977).

■ Bethlehem's official reports, submitted as required by the NPDES program, indicate that Bethlehem has on numerous occasions exceeded permit limitations and thus violated its permit. Section 308 of the Act, 33 U.S.C. § 1318, provides that the Administrator of the EPA shall require all NPDES permit holders to monitor their discharges. Permit holders must maintain records of the results of this monitoring, and report the results to the relevant state or federal agency in a DMR. 40 C.F.R. 122.41(1)(4)(i). Permit holders must certify the accuracy of information contained in their DMRs. 40 C.F.R. 122.22(d). The DMRs must contain a complete and accurate record of pollutant monitoring by the permit holders. 40 C.F.R. §§ 122.22(d), 122.41(1)(4)(i). Accuracy is further encouraged by the availability of criminal penalties for false statements. 33 U.S.C. § 1319(c)(2); *Menzel v. County Utilities Corp.,* 712 F.2d 91, 94 (4th Cir.1983).

■ Defendant has admitted in its DMRs that it violated its permit limitations on 369 occasions. Generally, reports or records which are required to be kept by law, such as DMRs, may be used to establish a defendant's liability. *See United States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980) (Report required under § 311(b) of the Act used to establish liability under § 311(c)); *Student Public Interest Research Group of New Jersey, Inc. v. Fritzsche, Dodge & Olcott,* 579 F.Supp. 1528, 1538 (D.N.J.1984); *Student Public Interest Research Group, Inc. v. Monsanto Co.,* 14 Envt'l L.Rep. (ELI) 20228, 20230–31 (D.N.J.1983); *Chesapeake Bay Foundation and Natural Resources Defense Council v. Gwaltney of Smithfield,* Civ.Act. No. 84–0366 R (E.D.Va. August 28, 1984).

The conclusion that DMRs may be used to establish liability is consistent with the legislative history and the avowed policy of the Act. The discussion in Congress re-

garding monitoring and enforcement reveals that Congress intended to keep enforcement actions simple and speedy. Monitoring and reporting requirements were added because of a recognized need to obtain accurate information and were designed to be enforceable.

A necessary adjunct to the establishment of effective water pollution requirements and the enforcement of such requirements is authority to require information, data, and reports, as well as to establish monitoring requirements.

\* \* \* \* \* \*

[T]he bill reported from the Committee establishes and makes precise new requirements imposed on person and subject to enforcement. One purpose of these requirements is to avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement. Enforcement of violations of requirements of this Act should be based on relatively narrow fact situations requiring a minimum of discretionary decision making or delay.

S.Rep. No. 92–414, 92d Cong. 2d Sess., *reprinted in* 1972 U.S.Code Cong.Ad.News 3728, 3730.

The discussion of Section 505 citizen suits in the same Senate report is to the same effect:

An alleged violation of an effluent control limitation or standard, would not require reanalysis of technological in [sic] other considerations at the enforcement stage. These matters will have been settled in the administrative procedure leading to the establishment of such effluent control provision.

\* \* \* \* \* \*

The standards for which enforcement would be sought either under administrative enforcement or through citizen enforcement procedures are the same.... Consequently, the factual basis for enforcement of requirements would be available at the time enforcement is sought, and the issue before the courts would be a factual one of whether there had been compliance.

S.Rep. No. 92–414, 92d Cong. 2d Sess., *reprinted in* 1972 U.S.Code Cong.Ad.News 3745, 3746.

Courts have granted summary judgment on the issue of liability based on a reading of a defendant's DMRs, even when a defendant disputed the accuracy of those reports, noting the Congressional intent that enforcement be based on reporting pursuant to the Act's requirement. "Defendant's last minute claims that it may have been erroneously overzealous in documenting its own transgressions will not deter our entering an order of summary judgment in favor of plaintiffs on the issue of liability." *Fritzsche, Dodge & Olcott, supra,* at 1539. As Judge Gerry noted in *Monsanto* I, *supra:*

This Court in this suit is not called upon to itself delve into the complex questions of what quantities of pollutants are safe or what various industries can be expected to accomplish in reducing pollution. All the Court here is called upon to do is compare the allowable quantities of pollution listed in the permits with the available statistics on actual pollution. This comparison seems no more complicated than much other work the Court does, if I say so immodestly.

Defendant argues, however, that the DMRs do not establish liability because they sometimes reflect "inaccurate monitoring" on Bethlehem's part. Bethlehem has submitted the affidavit of J. Daryl Tuckey concluding that four of the reported incidents were due to inaccurate monitoring and that further investigation might reveal other incidents of apparent non-compliance that were actually due to inaccurate monitoring.

Given the heavy emphasis on accuracy in the Act and the clear Congressional policy that DMRs should be used for enforcement purposes, the Court will not accept claims of inaccurate monitoring as a defense to this action. Other courts which have considered the inaccurate reporting defense have rejected it *Fritzsche, Dodge & Olcott,*

*supra,* at 1538–39; *Monsanto I, supra; Tenneco Polymers, supra,* at 1400. In *Tenneco Polymers,* the defendant had submitted affidavits similar to the one submitted here indicating that there might be inaccuracies in the testing procedures; the Court held that the affidavits did not raise a question of fact that there were errors in the tests performed which showed permit violations. Summary judgment was therefore held appropriate. Bethlehem has submitted documents concluding that the testing procedures used regarding one incident must have been inaccurate because other available records did not indicate non-compliance. However, the letter submitted did not refer to any error in the tests performed, but merely stated a conclusion that the reporting must have been inaccurate. Given the strong emphasis by Congress and other courts on the need for accurate reporting and simple enforcement, the Court will not accept the conclusions asserted by the defendants as raising a genuine issue of material fact with regard to any of the alleged inaccuracies.

Defendant has also argued that some of the incidents of apparent non-compliance may be excused as "upsets." An "upset" is defined as "an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation." 40 C.F.R. 122.41(n)(1). Proof of an upset may constitute an affirmative defense to a charge of a permit violation.

The regulations specify various requirements that a permit holder must satisfy before establishing an upset as an affirmative defense.

*Conditions necessary for demonstration of upset.* A permittee who wishes to establish the affirmative defense of upset shall demonstrate through proper-ly signed, contemporaneous operating logs, or other relevant evidence that:

[i] an upset occurred and that permittee can identify the specific cause(s) of the upset;

[ii] the permitted facility was at the time being properly operated;

[iii] the permittee submitted notice of the upset as required in paragraph [1][6][ii][B] of this Section [24 hour notice];

[iv] the permittee complied with any remedial measures required under paragraph (d) of this section.

40 C.F.R. 122.41(n)(3). The burden of establishing the occurrence of an upset rests with the permitee. 40 C.F.R. 122.41(n)(4).

Bethlehem has not submitted the necessary proof required to ultimately prove the occurrence of an upset. Bethlehem has presented the affidavit of J. Daryl Tuckey, "concluding" that 57 of the incidents of excessive discharge were in fact due to upsets. The affidavit raises some question as to whether the 57 incidents of non-compliance may be excused, and therefore summary judgment would be inappropriate with respect to those incidents which Tuckey concluded were upsets.

Plaintiffs' motion for summary judgment on the issue of liability will be granted with respect to all incidents of non-compliance occurring within the five year period before August 24, 1984, not allegedly excused as upsets. Summary judgment is denied with respect to the fifty-seven incidents allegedly excused as upsets, because defendant has raised a sufficient issue of material fact with respect to those violations.

The issue of remedies will be decided at a later date. At that time, the Court will address the defendant's argument that the plaintiffs cannot seek penalties for past violations.