695 A.2d 1252

**A.H. SMITH ASSOCIATES LIMITED PARTNERSHIP**

v.

**MARYLAND DEPARTMENT OF the ENVIRONMENT.**

**No. 1655, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

June 27, 1997.

---

234

S. Kennon Scott, Annapolis, for Appellant.

Norma Jean Kraus Belt, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for Appellee.

Argued before WENNER, CATHELL and SONNER, JJ.

CATHELL, Judge.

The Maryland Department of the Environment (MDE), appellee, brought a civil enforcement action against A.H. Smith Associates Limited Partnership (A.H. Smith), appellant, for alleged violations of 1) a Consent Order and 2) a wastewater discharge permit over the period of March 1991 through September 1994. The Circuit Court for Prince George's County (Spellbring, J., presiding) found that appellant had

violated the Consent Order and the permit and imposed civil fines against appellant in the amount of $49,000. From that decision, appellant noted a timely appeal to this Court and now presents three issues for our consideration:

1. Whether the Trial Court abused its discretion in construing [the] Consent Order and permit language in favor of the Appellee, and against the Appellant, thereby improperly imposing liability.

2. Whether the Trial Court erred in concluding that the Appellant violated the Consent Order and the permit.

3. Whether the Trial Court abused its discretion in awarding $1,000.00 per violation despite clear and uncontroverted mitigating factors in favor of Appellant.

Finding no error on the part of the trial court, we shall affirm. As they are intertwined, we shall answer appellant's first two questions together. We relate first the applicable statutory scheme and relevant facts.

### Background

The Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, generally prohibits the discharge of pollutants into the waters of the United States from point sources unless a permit has been obtained from the U.S. Environmental Protection Agency (EPA). Under a procedure established by Congress in § 402 of the Clean Water Act, 33 U.S.C. § 1342, EPA may delegate its authority to grant National Pollution Discharge Elimination System (NPDES) permits to a state with respect to point sources located within that state. A violation of an NPDES permit, whether issued by EPA or state authorities, is a violation of the Clean Water Act, thereby exposing the permit holder to liability. *See Environmental Protection Agency v. California,* 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976).

The State of Maryland is authorized by the EPA to administer the NPDES program for point sources located in this State. This authority is vested with MDE, appellee. Under both the Clean Water Act and the Environment Article of the

Maryland Code, MDE is empowered to attach certain terms and conditions to permits. *See* 33 U.S.C. § 1342; Md.Code (1982, 1996 Repl.Vol.), §§ 9–324, 9–326 of the Environment Article (EN). These terms and conditions may include installing monitoring equipment, sampling discharges, recording test results, and reporting to MDE on a regular basis, as well as any other "conditions [MDE] considers necessary to prevent" unpermitted discharges. EN § 9–326(a); *see also* 33 U.S.C. § 1318. Furthermore, the issuance of a permit is contingent upon the permittee granting MDE "a right of entry on the permit site at any reasonable time to inspect and investigate for violation or potential violation of any condition of the permit." EN § 9–326(b); *see also* 33 U.S.C. § 1318(a).

Once a final determination on a permit application has been made, the permittee has fifteen days within which to file a challenge to any term or condition contained in the permit. Code of Maryland Regulations (COMAR) 26.08.04.01–3(C)(2); *accord Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 608 F.Supp. 440, 443 (D.Md.1985) ("Under Maryland law, a permit holder may challenge a permit's terms and conditions only during the 15[–]day period" after publication of the notice of final determination.); *see also Adams v. United States Envtl. Protection Agency*, 38 F.3d 43, 51 (1st Cir.1994) (stating that public participation in permitting processing is to alert agency to potential problems with permits and ensure that agency has opportunity to address those problems before permit becomes final). After that time, "[t]he obligations and limitations of NPDES permits are binding . . . and may not be reexamined in an enforcement proceeding." *Chesapeake Bay Found.*, 608 F.Supp. at 443. Moreover, compliance with the permit becomes a matter of strict liability. *Sierra Club v. Simkins Indus., Inc.*, 617 F.Supp. 1120, 1128 (D.Md.1985), *aff'd*, 847 F.2d 1109 (4th Cir.1988), *and cert. denied*, 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989); *Student Pub. Interest Research Group v. Tenneco Polymers, Inc.*, 602 F.Supp. 1394, 1400 (D.N.J.1985) ("Enforcement of NPDES permits is based on strict liability."); *see also Chesapeake Bay Found.*, 608 F.Supp. at 451–53.

A.H. Smith, appellant, owns and operates a sand and gravel processing facility in Branchville. At this facility, appellant uses water to wash sand and gravel in preparation for its sale to contractors for use in construction projects throughout the State. As its principal water source, A.H. Smith drafts water from Indian Creek and an unnamed tributary of the creek, both of which run adjacent to appellant's property. The water is then injected into scrubbers with the sand and gravel, where it rinses away dirt and clay. The water, together with the dirt and clay, then flows into holding ponds, where the dirt and clay settle out. From these ponds, the water is discharged through an outfall back into the unnamed tributary upstream of the intake point. The largest of appellant's ponds is approximately thirty acres.

On March 26, 1991, A.H. Smith and MDE entered into a Consent Order, CO–91–0137, which allowed for the discharge of wastewater until MDE made a final determination on the issuance of a permit. Subsequently, on May 16, 1991, MDE issued a wastewater discharge permit, 91–DP–2865, to appellant. This permit is a joint federal NPDES and State discharge permit. Under both the Consent Order and permit, appellant was authorized "to discharge wastewater, consisting of sand and gravel wash water and stormwater runoff, to an unnamed tributary of Indian Creek." This discharge was subject to a daily maximum effluent limitation for total suspended solids (TSS) of 60 milligrams per liter (mg/l) and a monthly average maximum of 30 mg/1. The effluent limitation on turbidity set 100 nephelometric turbidity units (NTU) as the daily maximum and 50 NTU as the monthly average limit. These limits were to be monitored once per week utilizing a grab sample.[1] Both the Consent Order and permit authorized MDE to enter upon A.H. Smith's property at reasonable times to obtain samples. The Consent Order, but not the permit, specified that a stipulated penalty of $1,000 would be imposed for each violation.

---

1. A grab sample is essentially the filling of a container directly from the outflow of the source (the grab) at a given point in time.

On March 26, April 4, April 10, April 23, May 7, and May 14, 1991, an MDE field inspector visited appellant's facility, obtained grab samples, and determined that appellant's discharges were not in compliance with the effluent limitations for both TSS and turbidity as set forth in the Consent Order. The inspector also found that on April 4, April 16, and April 29, 1991, appellant ·had discharged wastewater from a point other than the agreed-upon discharge point. MDE determined further that, during the month of April 1991, appellant had exceeded the monthly average limitation for both TSS and turbidity.

Following issuance of the permit, MDE personnel found violations of the effluent limitations for either TSS, turbidity, or both on May 29, June 5, June 13, June 18, June 26, July 16, July 23, July 30, August 6, September 4, September 10, September 26, October 1, October 31, November 14, November 27, and December 18, 1991, June 1, June 9, July 29, September 9, and December 22, 1992, February 18, December 2, and December 14, 1993, and March 22, May 11, May 17, June 29, July 27, and September 28, 1994. MDE also determined that, in May, June, and July 1991, appellant's discharges had exceeded the permissible monthly average concentration for TSS, and that appellant had exceeded the allowable monthly average concentration for turbidity in May and June 1991. Furthermore, MDE found that, on September 9, 1992, February 5, 1994, and May 11, 1994, appellant had discharged wastewater from a point other than the location authorized in the permit.

MDE instituted this civil enforcement proceeding in the Circuit Court for Prince George's County, pursuant to its authority under Maryland Code (1982, 1996 Repl.Vol.), § 9-342(a) of the Environment Article. MDE's Second Amended Complaint for Injunction and Civil Penalty sought a total civil penalty of $297,000 for all of the alleged violations and an injunction requiring A.H. Smith to cease violations of the permit. Specifically, count 1 of the complaint sought the imposition of $17,000 in penalties for violations of the Consent Order. The second count sought penalties of $227,500 for

discharges in excess of the daily maximum effluent limitations for both TSS and turbidity as contained in the permit; similarly, count 3 sought penalties in the amount of $22,500 for violations of the permit-based monthly average effluent limitations, and count 4 sought $30,000 in penalties for discharges from locations other than that specified in the permit. In addition, as stated, MDE sought an injunction requiring A.H. Smith to cease all discharges in violation of the permit.

The circuit court found that appellant had indeed discharged wastewater in violation of both the Consent Order and permit. The court imposed fines against A.H. Smith totalling $49,000, but declined to issue an injunction. Appellant noted this appeal therefrom.

We shall relate additional facts in our discussion of the questions presented.

### Did the circuit court properly determine that A.H. Smith had violated the terms of the Consent Order and wastewater discharge permit?

Both the Consent Order and permit base certain violations upon exceedances of the effluent limitation daily maximums. The "daily maximum" is defined in both the Consent Order and permit as follows:

The "daily maximum" effluent limitation by concentration means the highest allowable reading of any daily determination of concentration.

"Daily determination of concentration" is also defined in both the Consent Order and permit:

"Daily determination of concentration" means one analysis performed on any given sample representing 24-hours flow, with one number in mg/1 as an outcome.

As stated, violations of the permit and Consent Order were determined by MDE based upon the results obtained from taking grab samples. These samples were gathered by placing a one-quarter liter bottle under the outfall for no more than fifteen minutes and allowing the bottle to fill—*i.e.*, a one-

quarter liter sample was literally grabbed from out of the outflow.

On appeal, A.H. Smith contends that "the trial court abused its discretion by improperly interpreting the Consent Order and permit language in favor of the State and against the appellant, in determining that the Appellant had, in fact[,] violated the statute at issue[.]" More specifically, appellant states, "In this case, the dispute is whether the State's sampling methods complied with the language of the Consent Order[ ] and Discharge Permit[ ] and[,] consequently, provided sufficient evidence for the Trial Court to find a violation of Maryland Code, Environment Article, § 9–342." Stated otherwise, appellant alleges that a grab sample is not "any given sample representing 24–hours flow" and, thus, is insufficient to be the basis for a finding that appellant exceeded the effluent limitations in the Consent Order and permit.

■ The circuit court rejected this argument. The court found "that [MDE's] lab reports do in fact qualify, and I received them as evidence." In other words, the court found that a grab sample was representative of the flow within that twenty-four hour period and was, thus, sufficient to support a finding that a violation had occurred. We agree.

Under appellant's theory, MDE would be required to obtain an unspecified number of samples over a twenty-four hour period and then average the results obtained. This argument is unpersuasive. Principally, this is not what is called for under the applicable terms of the Consent Order and permit. Both the Consent Order and permit imposed sampling requirements, as MDE was entitled to do, of once per week by grab sample. This is precisely how violations were established. Neither the Consent Order nor the permit contemplated the taking of samples more than once per week—let alone more than once within each twenty-four-hour period—or by a method other than a grab sample. Appellant's position would require appellee to maintain personnel on appellant's site twenty-four hours a day or sample by a means other than

that specified in the consent order and permit. That clearly is not what was contemplated by the Consent Order and permit.

Under EN § 9–331(4), MDE may require a permit holder "[t]o sample discharges in accordance with the methods, at the locations, at the intervals, and in the manner [MDE] requires." EPA has determined that grab samples are to be utilized to determine the effluent characteristics of discharges from holding ponds. *See* 40 C.F.R. § 122.21(g)(7). This is the requirement imposed upon appellant under both the Consent Order and permit. A.H. Smith could only obtain the permit if it acquiesced to those specifications, which it, in fact, did.

There was in place a procedure by which appellant could contest the sampling methodology set forth in the permit. A.H. Smith did not avail itself of that procedure. Once a final determination on appellant's permit application was made, appellant had fifteen days within which to file a challenge to any term or condition contained in the permit. Once that period elapsed, the obligations and limitations contained in the permit, including the methodology by which violations would be determined, became binding. They may not be reexamined now in this enforcement proceeding, *Chesapeake Bay Found.*, 608 F.Supp. at 443, which is precisely what appellant is attempting to do.

Furthermore, a consent order is a valid contract between the parties that is judicially enforceable. *See, e.g., Johnson v. Robinson*, 987 F.2d 1043, 1046 (4th Cir.1993) ("The binding force of a consent decree comes from the agreement of the parties."); *Bernstein v. Fernandez*, 649 A.2d 1064, 1073 n. 12 (D.C.1991); *Baker v. District of Columbia*, 494 A.2d 1299, 1302 (D.C.1985) (consent decree entered into by contractor and Office of Consumer Protection is "a valid contract between the parties"); *Padgett v. Padgett*, 472 A.2d 849, 852 (D.C.1984) ("A consent order is ... a type of contract and places the parties in a contractual relationship."). Consequently, at least as to the violations under the Consent Order, appellant contractually agreed that violations would be determined by the taking of grab samples, and we decline to release

appellant from its bargain. *See Baran v. Jaskulski,* 114 Md.App. 322, 333, 689 A.2d 1283 (1997); *Shallow Run Ltd. Partnership v. State Highway Admin.,* 113 Md.App. 156, 172, 686 A.2d 1113 (1996).

In addition, A.H. Smith did not present any evidence below tending to show that MDE's sampling method returned inaccurate results. Accordingly, appellant's allegation that utilization of a single grab sample did not return results that represented the average of the discharge over each twenty-four hour period is merely speculation. In other words, A.H. Smith would have MDE take an unspecified number of samples over the course of a day, average the results, and then use that result to determine whether it had discharged in violation of the effluent limitations. Yet appellant did not show that this proposed method would return results different from those obtained by MDE. Thus, even if we were to accept appellant's position (and we do not), there is no evidence that appellant did not discharge in violation of the applicable effluent limitations on those days when violations were found by MDE—*i.e.,* there is no evidence to refute MDE's findings that appellant's discharges were not in compliance with the permit and/or Consent Order on those days when violations were found.

Furthermore, appellant's argument that more than one sample must be taken and the results averaged, renders meaningless that part of the definition of "[d]aily determination of concentration" that provides that only "one analysis" is to be performed on the representative sample. We decline to find that this language is surplusage, which we must were we to adopt A.H. Smith's position.

Finally, both the permit and the Consent Order provided that "[s]amples and measurements taken as required herein shall be taken at such times as to be representative of the quantity and quality of the discharges during the specified monitoring periods." This clause, which was agreed to by A.H. Smith in the Consent Order and not timely challenged in the permit, specifies that a single grab sample, the sampling

method "required herein," could be "representative" of appellant's discharge during the specified monitoring periods, such that a single grab sample could be "any given sample representing 24–hours flow." And, because there was no evidence presented below that MDE's samples were taken at a time that was not representative of the quantity and quality of A.H. Smith's discharges, those samples were sufficient to support a finding of a violation.

### Did the trial court abuse its discretion in imposing penalties?

Arguing in the alternative, A.H. Smith contends that the court abused its discretion in meting out fines against it by not applying "mitigating factors" to lessen the amount of the penalties. Appellant points to the fact that 1) it was discharging dirt and clay, and not toxic chemicals; 2) there was no evidence presented below that appellant received any economic benefit as a result of its noncompliance; 3) there were substantial periods when appellant's discharges were in compliance with the effluent limitations; and 4) there was evidence below that, when appellant became aware of a violation, it responded promptly to remedy the situation.

Initially, we note that, apart from the argument resolved above, A.H. Smith does not contest the number of violations found; appellant only challenges the total penalty imposed. As to violations of the Consent Order, the circuit court imposed penalties against A.H. Smith as follows:

On Count One[,] I do not find that I have any discretion, and that the Consent Order requires that I impose a penalty of $1,000. per violation.

I further find on Count One that there was an unauthorized discharge on April 29th, 1991 when the treatment system was bypassed....

... I decline to impose penalties for violations of both the turbidity standard, and the TSS standard on the six days on which I have found violations of [both under] the Consent Order. So, I impose a fine of $7,000, on Count One, which

would be for six violations of the maximum daily effluent limitation, and one violation of the unauthorized discharge.

The Consent Order, in relevant part, provided:

If [A.H.] Smith Associates fails to fully comply with any requirement set forth in this Order, [A.H.] Smith Associates agrees to pay a stipulated penalty of one thousand dollars ($1,000.00) for each violation. [A.H.] Smith Associates waives any rights to a hearing on the amount of the penalty but reserves the right to a hearing to determine liability, in the case of each violation. . . .

■ As to the amount of the penalty for each violation, in the Consent Order, a contract, A.H. Smith agreed that it would be liable for $1,000 for each violation and waived any right to contest the amount of the penalty. The trial court required appellant to comply with the terms of its bargain, and, other than arguing that the court abused its discretion in not applying "mitigating factors," appellant has not argued why it should not be held to the bargain it struck. We, similarly, decline to release appellant from its bargain. *See Baran, supra,* 114 Md.App. at 333, 689 A.2d 1283; *Shallow Run, supra,* 113 Md.App. at 172, 686 A.2d 1113.

■ In regard to the number of violations under the Consent Order, the trial court found that appellant had exceeded the daily maximum effluent limitation for TSS on six dates, the daily maximum effluent limitation for turbidity on six dates, and had discharged from a location other than that agreed to once. The six days on which the daily maximum effluent limitation for TSS was exceeded were the same days upon which the daily maximum effluent limitation for turbidity was exceeded, however, in an exercise of its discretion, the trial court declined to find twelve separate violations. Rather, the court found six; one for each day, without regard to the number of Consent Order terms that were contravened on that day. To this the court added the one violation for a discharge from an unauthorized point, for a total of seven, and

we perceive no abuse of the court's discretion in imposing $7,000 in fines for violations of the Consent Order.[2]

The court imposed civil penalties as follows in regard to permit violations:

On Count Two, I find that there have been violations on 30 separate dates. [I] [a]gain ... decline to impose penalties on dates when there's violations of both the turbidity standard and the TSS standard. I exercise my discretion in imposing penalties on these 30 separate dates, and in the exercise of that discretion impose a fine of $1,000. per day for a total of $30,000, on Count Two.

In the exercise of that discretion, I consider both the agreement as to penalties reached by the Plaintiff and Defendant in the Consent Order, the factors that may be considered in administrative proceedings under 9-342(b) as well as the other findings of fact, such as the responsiveness of the Defendant[,] in the content of [the] discharge and others as mentioned previously.

On Count Three, on the finding of a violation of the monthly average effluent limitations I impose a fine, a penalty of $3,000. for the month of May, $3,000 for the month of June, and $1,000. for the month of July, for a total of $7,000.

On Count Four, the unlawful discharges, having found violations there, I impose a penalty of $3,000. for the

2. The term "violation" is not defined in either the Consent Order or the permit. Section 9-342(a) of the Environment Article specifies that "[e]ach day a violation occurs is a separate violation under this subsection." This, however, apparently leaves open the issue of, if a consent order or permit contains more than one effluent limitation and all are violated on the same day, whether a separate fine may be imposed for each one or may only one violation be found for the entire day. Our holding in the case *sub judice*, that the court did not abuse its discretion in limiting the imposition of fines to one per day without regard to the number of terms in the consent order (or permit) that was violated on each day, is not to be taken as a holding that this is the only proper method for the imposition of civil fines. That issue is not presently before this Court, and its determination will have to wait for the appropriate case.

September 9th violation, and $1,000. for the February 5th and May 11th violation[s] for a total of $5,000.

■ Pursuant to section 9–342(a) of the Environment Article, in a civil enforcement action such as this one, a person who discharges in violation of a permit is liable for a civil penalty not exceeding $10,000. Each day a violation occurs is a separate violation under this subsection. Section 9–342(b), which is only applicable in administrative enforcement actions, sets forth numerous factors that must be considered in the setting of penalties. These factors are not, however, required to be considered before penalties are set in a civil action.

The circuit court found a total of thirty-six violations under the permit. The court would have, therefore, been within its discretion to impose a fine of $360,000. The court reduced that sum to $42,000. In doing so, the court considered three factors: 1) the amount of the penalty to which appellant had agreed in the Consent Order; 2) the factors applicable to the imposition of fines in administrative adjudications as set forth in EN § 9–342(b); and 3) the court's decision that it would not impose more than one fine per day regardless of the number of permit terms contravened on that day.

■ We perceive no abuse of discretion in the circuit court's findings. Despite appellant's argument that foreign courts have faced more egregious cases and imposed what appellant perceives to be lesser fines on a percentage basis, the determination of those cases was based upon the facts of each. Each case stands on its own merits. *See, e.g., Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.,* 791 F.2d 304, 314–15 (4th Cir.1986) (stating that it "is important ... to adopt an approach that will give [trial] courts the continuity of possibilities necessary for them to assess appropriate sanctions in every case"), *vacated on other grounds,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). There is nothing in the amount of penalty imposed or the court's reasoning therefor that suggests that Judge Spellbring abused his discretion. Accordingly, we shall affirm the judgment of the circuit court.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**