Victor **RAMIREZ**, etc., et al.,
Plaintiffs, Appellees,

v.

Jaime **RIVERA–DUENO**, etc., et al.,
Defendants, Appellants.

No. 88–1423.

United States Court of Appeals,
First Circuit.

Heard Oct. 7, 1988.

Decided Nov. 17, 1988.

Rehearing and Rehearing En Banc
Denied Jan. 13, 1989.

Pedro A. Del Valle–Ferrer, Director, Federal Litigation Div., Dept. of Justice, with whom Rafael Ortiz Carrion, Sol. Gen., and Norma Cotti Cruz, Deputy Sol. Gen., Dept. of Justice, San Juan, P.R., were on brief, for defendants, appellants.

Ana Matanzo Vicens, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

For more than a decade, plaintiffs, representing mentally retarded persons, have engaged in protracted litigation and negotiation with Puerto Rico's Secretaries of Health and of Social Services over the quality of services for mentally retarded persons in Puerto Rico. At the hub of the present appeal is a court-approved agreement entered into by the two sides in 1984 in lieu of a trial that was then scheduled. The two sides take sharply contrasting views of this agreement. While the plaintiffs view it as a definitive and binding settlement of the case, the defendants view it as merely an arrangement—one that has proved futile—to work *towards* a negotiated settlement. Adopting plaintiffs' view of the matter, the district court has denied defendants' present motion for a trial. We believe that the defendants' view of the 1984 agreement is more accurate, and rule that they have a right to a trial.

## I. BACKGROUND

The complaint was filed in 1977 on behalf of mentally retarded persons in Puerto Rico. Although the complaint was put forth as a class action, a class was never certified.[1] The complaint, as amended most recently in 1981, alleges that the Commonwealth of Puerto Rico has failed to provide necessary residential and treatment services for mentally retarded adults, and that this failure has amounted to a deprivation of plaintiffs' civil rights. Plaintiffs seek declaratory and injunctive relief under 42 U.S.C. § 1983 (1982) and various United States constitutional provisions and statutes, as well as under the Constitution of Puerto Rico.

Between 1977 and 1983, the case proceeded before four different federal district judges, with a changing cast of attorneys. It was set for trial on September 20, 1983.

---

1. The complaint was originally filed on behalf of both mentally retarded adults and mentally retarded children, and the defendants included Puerto Rico's Secretary of Education, as well as the Secretaries of Health and of Social Services. At present, however, the suit encompasses the complaints only of mentally retarded adults, and educational services are no longer at issue.

Several weeks before that date, the court granted defendants a continuance in order to try to reach a preliminary agreement with plaintiffs. On December 20, 1983, in the face of delays, the district court granted the parties a final extension until January 31, 1984, "to file the preliminary agreement or be prepared to show cause why sanctions should not be imposed." On January 31, 1984, the parties filed a joint motion reporting the following agreement ("the 1984 agreement"):

1. The parties agree that plaintiffs will paralize [sic] the prosecution of this suit for the period of a year and a half from the date of filing of this Motion if the terms and conditions of the Executive Order, included as Exhibit A of this motion, are met.

2. The parties will file a joint status report every six months.... Said report shall include the status of compliance with the terms and conditions of the Executive Order....

The district court approved the agreement on February 2, 1984.

In the executive order referred to in the agreement, the Governor of Puerto Rico ordered that all existing services for the mentally retarded be consolidated within the Department of Health. After this consolidation the Department of Health was to "formulate a comprehensive health services system for said population incorporating the existing services and those newly created which are necessary...." The plan for the services was to be prepared within a year and a half, and then "must be available for the consideration and approval of the Governor."

In the two years that followed the agreement, defendants submitted to plaintiffs several versions of a plan for services for the mentally retarded, but plaintiffs rejected these plans as inadequate. In March 1986, plaintiffs requested the court's permission to resume the prosecution of the case "since the terms of the Stipulation between the parties have not been complied with." The district court apparently never ruled on this motion. Instead, further negotiations commenced between the parties.

In a joint status report, submitted to the court on March 5, 1987, the parties concluded that a comprehensive plan was "still necessary," and they outlined a new timetable for the development of a plan.

Even after this renewed effort, the parties proved unable to move toward a mutually acceptable solution. On August 17, 1987—more than ten years after the inception of the suit—the district court appointed a special master, citing "the need to constantly and effectively monitor the activities of the defendants in their compliance with their obligations under the Court's Order dated December 20, 1983." (The December 20, 1983 order was the one that directed the parties, upon penalty of sanctions, to file their preliminary agreement with the court.) Defendants' motion to vacate the order appointing the special master was denied. On September 21, 1987, defendants proposed a new two-year plan, accompanied by a proposed new executive order of the Governor. The district court referred this proposal to the special master. According to defendants, two days prior to the scheduled hearing before the special master, plaintiffs' attorney informed defendants that this new plan, like the previous ones, was unacceptable to plaintiffs.

On December 15, 1987, defendants filed the motion that is the focus of the present appeal. Claiming that the parties had reached an impasse, defendants stated that they were withdrawing from any further negotiations and requested that the long-delayed trial be rescheduled. Shortly afterward, on December 30, defendants submitted an answer to plaintiffs' six-year-old amended complaint.

On February 26, 1988, the district court issued an opinion and order responding to defendants' request for a trial. After reviewing the history of the case, the district court concluded that the January 31, 1984 agreement was in fact a settlement agreement—transformed by court approval on February 2, 1984, into a consent decree—in which both parties had permanently surrendered their right to a trial. Accordingly, the court denied defendants' request for a

trial, as well as their motion submitting an answer to the amended complaint. The court ruled that it had "jurisdiction to enforce the settlement agreement of January 31, 1984, as amended by the Joint Agreement [the joint status report] of March 5, 1987." To this end, the court instructed the special master to "meet with the parties to determine whether consensus can be reached on a Plan as mandated by the settlement agreement and, if consensus should prove to be unavailing, to report to the Court on who is responsible for the failure of compliance, with his recommendations on how the Court should proceed."

## II. WAS THE 1984 AGREEMENT A SETTLEMENT AGREEMENT?

■ The pivotal issue in this appeal is whether the January 1984, agreement was, in fact, a "settlement agreement" that obviated the need for plaintiffs to prove at trial that defendants had violated their constitutional or other federally protected rights and, for that reason, owed the plaintiffs redress. If it was such a settlement agreement—transformed by court approval into a consent decree—then the district court would have been within its power to deny defendants a trial and instead to press for compliance with the agreement. If, on the other hand, the 1984 agreement was merely an arrangement to work toward a mutually acceptable agreement—as defendants insist—then the district court exceeded its authority when it refused to grant defendants a trial, since defendants cannot be required to adhere to the court's remedies without first having been found to have violated the law. Thus, we now consider the nature of the 1984 agreement. We postpone until afterward discussion of whether the district court's order is appealable or otherwise reviewable by this court.

In the district court's view of the critical events, "[t]hrough the process of negotiation the parties reached a settlement agreement on January 31, 1984, consisting of the terms of Executive Order 4234, signed by the Governor on February 1, 1984, and approved by the Court the following day." As the district court saw it, the agreement was one in which the parties gave up their respective claims and defenses, and subjected themselves to the district court's supervisory authority. The district court likened the 1984 agreement, together with the March 1987 joint status report, to an "affirmative action" consent decree:

Typically, a settlement agreement avoids admissions of responsibility and culpability with reference to the claims set forth in the complaint. Rather the parties agree to focus on affirmative action, foregoing their respective claims and defenses. That is what took place in this case. The complaint contained a number of alleged violations of constitutional and statutory rights. Defendants were entitled to put their defenses to the test of a trial, as were plaintiffs with respect to their claims. Both parties chose an alternative course: not to litigate through trial, but rather to reach settlement on the basis of a joint agreement under the aegis of the Court. The Joint Agreements, both on January 31, 1984 and on March 5, 1987, in effect substituted for the claims and defenses of the parties' complaint and answer a course of affirmative action which both parties implicitly recognized was remedial in nature. The Court's stamp of approval made it the ultimate guardian of the settlement agreement's enforcement. *See Local No. 93 v. City of Cleveland*, 478 U.S. 501, 106 S.Ct. 3063, 3075–76, 92 L.Ed.2d 405 (1986).

As already noted, defendants take a very different view of the 1984 agreement, regarding it as merely an arrangement to suspend litigation, in an effort to move toward a mutually acceptable agreement. In defendants' view, the agreement did not renounce any defenses on the issue of liability. Rather, it entailed only a promise by plaintiffs to "paralize [sic] the prosecution of this suit for a period of a year and a half ... if the terms and conditions of the Executive Order ... are met."

After reviewing the terms of the 1984 agreement, in the context of the history of this litigation, we conclude that the defendants' interpretation is correct. As the Supreme Court observed in the "affirmative

action" case that the district court cited in its opinion and order, "it is the agreement of the parties ... that creates the obligations embodied in a consent decree." *Local No. 93, International Association of Firefighters v. City of Cleveland,* 478 U.S. 501, 522, 106 S.Ct. 3063, 3076, 92 L.Ed. 2d 405 (1986). The text of the 1984 agreement makes apparent that defendants did not renounce for all time their basic right to litigate the question of their own liability in favor of a judicially supervised settlement. Instead, the parties merely arranged to suspend the litigation in the *hope* of arriving at a settlement. Moreover, the executive order of the Governor, included as Exhibit A of the 1984 agreement, makes no reference to the litigation. The executive order seems most appropriately viewed as a statement of the Governor's policy to develop a comprehensive plan for services to the mentally retarded, rather than as a commitment made specifically to the plaintiffs.

If the matter were not apparent enough from the text of the 1984 agreement, the conclusion that it was *not* a settlement agreement is buttressed by the fact that the parties themselves did not refer to their agreement as a "settlement agreement" or "consent decree." In the December 20, 1983 order—which the district court later cited as justifying its appointment of a special master—the court ordered the parties to file a "preliminary agreement," not a settlement agreement. In the March 1987 joint status report—viewed by the district court as an amendment of the "settlement agreement"—the terms "settlement agreement" and "consent decree" were not used. As far as we can tell from the record, the first time either the court or any party referred to the 1984 agreement

as a "settlement agreement" or "consent decree" was in plaintiffs' motion of January 15, 1988, opposing defendants' request for a trial.[2] Moreover, the district court's view that in the 1984 agreement both parties renounced their right to a trial is hardly consistent with *plaintiffs'* motion of March 1986, "to start again the prosecution of this case since the terms of the Stipulation between the parties have not been complied with."

Nor does anything in the joint status report of March 1987 serve to convert the 1984 agreement into a settlement agreement or consent decree. The March 1987 joint status report noted that through the 1984 agreement "the parties stayed prosecution of the present action pending defendant's compliance with the terms and conditions of [the] Executive Order." After reviewing the events since January 1984, the parties agreed that "A Plan for the creation of a 'Comprehensive System of Health for the Mentally Retarded' is still necessary," and defendants agreed to undertake a new set of efforts to develop such a plan. The joint status report added:

> Once the parties agree on the Plan and unless, in the case of disagreement a hearing is requested before the Court, it will be presented to the Governor of the Commonwealth of Puerto Rico for his consideration and approval and, thereafter, submitted to this Court.

As we read the joint status report, it reiterated the parties' intention to work toward a settlement, implicitly extending their agreement to suspend litigation. But nothing in the joint status report stated or implied that the parties had entered into (or were then entering into) a settlement agreement, or that either party was re-

---

2. Plaintiffs have not directed our attention to any instances in which anyone referred to the 1984 agreement as a "settlement agreement" or "consent decree" prior to their January 1988 motion. In fairness to the district court, we note that our own review of the record reveals several previous allusions to a "settlement agreement" or "consent decree." Before the 1984 agreement was entered into, defendants filed at least two motions for continuance in which they referred to their *aim* of reaching a "settlement" or "settlement agreement." And

after the 1984 agreement, in defendants' December 1987 motion for a trial, defendants cited the "consent decree" in the case of *Lelsz v. Kavanagh,* 807 F.2d 1243 (5th Cir.1987), in a context that seemed to liken the agreement in *Lelsz* to the one in the present case. But none of these scattered references directly characterizes the 1984 agreement as a "settlement agreement" or "consent decree." These references certainly do not outweigh the clear evidence provided by the text of the 1984 agreement itself that it was *not* a settlement agreement.

nouncing its claims, defenses, or right to a trial.

Settlement agreements are, of course, possible in the context of controversies about a state's services for the mentally retarded. When embodied in court-approved consent decrees, such agreements are enforceable by the district court. *See, e.g., Brewster v. Dukakis*, 675 F.2d 1 (1st Cir.1982) (consent decree resulting from a negotiated settlement of a class action suit by mentally disabled persons against the Commonwealth of Massachusetts). But given the major consequences of such a settlement agreement or consent decree, one would expect its character as such—including the willingness of defendants to forego their right to trial—to be far clearer than what is now before us.

We conclude, therefore, that there was, in fact, no settlement agreement between the parties and, therefore, no consent decree. Defendants, moreover, have engaged in negotiations and come forward with various plans and proposals in the four years since the January 31, 1984 order. In now requesting a trial, defendants assert that they have made "honest, sincere and good faith efforts in trying to carry out the [1984] agreement." They state that government officials have devoted considerable time and effort to preparing a series of plans for a comprehensive system of services to the mentally retarded. There is no finding that defendants have acted in bad faith. Under these circumstances, we can see no justification for requiring defendants, against their will, to continue to negotiate, given especially the fact that at no time has it been established that the Commonwealth is legally liable. Therefore, defendants' motion for a trial should be granted.

## III. THE REVIEWABILITY OF THE DISTRICT COURT'S ORDER

We turn now to what is, logically, the initial inquiry—whether this court has jurisdiction at present to review the district court's order denying defendants' request for a trial and instructing the special master to continue meeting with the parties.

Defendants contend that the order was appealable to the court of appeals either as a final judgment (under 28 U.S.C. § 1291 (1982)) or as an injunction (under 28 U.S.C. § 1292(a)(1) (1982)). Alternatively, they suggest that we are authorized to treat their appeal as a petition for a writ of mandamus (under the All Writs Act, 28 U.S.C. § 1651(a) (1982)). We consider in turn each of these possibilities.

■ 28 U.S.C. § 1291 provides for appellate review of "final decisions" of the district courts. The Supreme Court has stated that "as a general rule a district court's decision is appealable under this section only when the decision 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, —— U.S. ——, 108 S.Ct. 1133, 1136, 99 L.Ed.2d 296 (1988) (quoting *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). *See also Massachusetts Association for Retarded Citizens v. King*, 643 F.2d 899, 904 n. 12 (1st Cir.1981). It is hard to see how the district court's challenged order "ends the litigation on the merits." To the contrary, the order ensures that proceedings before the court will continue. Even if the district court's opinion and order is viewed as a final decision terminating *litigation*, it does not end the case "on the merits" because no relief has yet been ordered. *Cf. Garzaro v. University of Puerto Rico*, 575 F.2d 335, 337 (1st Cir.1978) (order finding defendants liable in a civil rights action but leaving open the issue of monetary damages is not appealable as a final order); *De Fuertes v. Drexel, Burnham, Lambert, Inc.*, 855 F.2d 10 (1st Cir.1988) (order compelling arbitration, but retaining jurisdiction, is not a final judgment). Although the district court's order may lead to delay and to additional litigation expense, these possibilities are "not sufficient to set aside the finality requirement imposed by Congress." *Richardson–Merrell Inc. v. Koller*, 472 U.S. 424, 436, 105 S.Ct. 2757, 2763, 86 L.Ed.2d 340 (1985).

■ Neither does the district court's order qualify as the sort of "collateral order"

in an ongoing case that is appealable as an exception to the final judgment rule under *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), and subsequent cases. To qualify for the collateral order exception, an order must, among other things, be "effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978). In this case, the district court's order would ultimately be reviewable on appeal from a final judgment in which relief was ordered.

■ Defendants argue that the district court's order may also be viewed as an injunction, inasmuch as it in effect orders defendants to continue meeting, against their will, with the special master. The order also directs that "if consensus should prove to be unavailing" the special master shall "report to the Court on who is responsible for the failure of compliance, with his recommendations on how the Court should proceed." Defendants view this portion of the order as raising the specter of sanctions against them. If the district court's order were in fact an injunction, it would be appealable under 28 U.S.C. § 1292(a)(1).

We do not fail to perceive the injunctive aspects of the district court's order. *Cf. Robbins v. George W. Prescott Publishing Co.*, 614 F.2d 3, 5 (1st Cir.1980) (noting that a district court's refusal to stay an order requiring arbitration may be analogous to an injunction, and thus appealable under 28 U.S.C. § 1292(a)(1)). Nevertheless, we do not think that the district court's order in the present case is an appealable injunction. As a general rule, "[a]n order by a federal court that relates only to the conduct or progress of the litigation before that court ordinarily is not considered an injunction and therefore is not appealable under § 1292(a)(1)." *Gulfstream*, 108 S.Ct. at 1138 (citations omitted). In particular, orders directing parties to prepare, submit, or participate in formulating plans—for example, in school desegregation litigation—have not generally been held to be appealable injunctions. *See, e.g., Taylor v. Board of Education*, 288 F.2d 600, 604 (2d Cir.

1961). *See generally* 16 C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice and Procedure* § 3922 (1977 & 1988 Supp.). Moreover, the district court's order does not directly order defendants to do anything. Instead, the order is directed at the *special master*, who is instructed to meet with the parties and "determine whether consensus can be reached." Such an order to a master is hard to view as injunction. *Cf. Teamsters Local Unions v. Braswell Motor Freight Lines, Inc.*, 428 F.2d 1371, 1373 (5th Cir.1970) (order referring question of damages to a master is not an appealable injunction), *cert. denied*, 401 U.S. 937, 91 S.Ct. 926, 28 L.Ed.2d 217 (1971). There may well be some truth to defendants' view that the order was "in effect an injunction [intended] to force them to negotiate a settlement against their expressed will." Still, the order on its face is not clearly injunctive.

■ While the district court's order is, therefore, not appealable, we exercise our discretion to treat defendants' appeal as a petition for mandamus under the All Writs Act, 28 U.S.C. § 1651(a). *See United States v. Sorren*, 605 F.2d 1211, 1215 (1st Cir.1979). The Supreme Court has recently reiterated that "the writ of mandamus is an extraordinary remedy, to be reserved for extraordinary situations." *Gulfstream*, 108 S.Ct. at 1143 (citations omitted). Thus, we do not readily utilize the writ of mandamus as a means of correcting a district court's unappealable orders. Instead, we restrict our use of the writ to "exceptional circumstances amounting to a judicial 'usurpation of power.'" *Will v. United States*, 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967) (quoting *DeBeers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 217, 65 S.Ct. 1130, 1133, 89 L.Ed. 1566 (1945)). *See also United States v. Sorren*, 605 F.2d at 1215 (mandamus appropriate only when the lower court is clearly without jurisdiction). The party seeking mandamus has the burden of showing that it has a clear and indisputable right to issuance of the writ. *Gulfstream*, 108 S.Ct. at 1143. Finally, we will not issue a writ of mandamus without a showing that interlocutory relief is necessary to

prevent irreparable harm. *In re Justices of the Supreme Court of Puerto Rico,* 695 F.2d 17, 20 (1st Cir.1982).

We conclude that this case presents one of those "extraordinary situations" that calls for the issuance of a writ of mandamus. In denying defendants' motion for a trial, the district court has exceeded its powers. To be sure, encouraging parties to settle their disputes by mutual agreement is a proper and often valuable part of the work of the district courts. And the district courts are obliged to enforce consent decrees, once they have been appropriately entered. But it is beyond a court's power to deny to a party its fundamental right to a trial on the issue of liability, under the aegis of a non-existent "consent decree."

The district court's denial of a trial to defendants causes "harm [that] goes far beyond the mere burden and expense of protracted litigation." *In re Perry,* 859 F.2d 1043, 1046 (1st Cir.1988). The parties are officials of the Commonwealth of Puerto Rico and persons representing a disabled group of citizens. Under the district court's opinion and order, defendants may be obliged to continue "negotiating" for years, even though every indication is that the negotiations are stalemated. The likely result would be a continuing state of hostility and uncertainty. Such a state of affairs would hobble the Commonwealth agencies and officials charged with responsibility for services to mentally retarded persons. And such a state of affairs would hardly be a boon to Puerto Rico's mentally retarded men and women themselves. As in another case in which we granted a writ of mandamus, the district court's order "ha[s] come to assume such importance in this case that justice requires us to deal with [it] now rather than later." *In re Puerto Rico Electric Power Authority,* 687 F.2d 501, 506 (1st Cir.1982).

The district court should vacate the opinion and order of February 26, 1988, and grant defendants' motion for a trial. In so ruling, we express no opinion about the validity of plaintiffs' various constitutional and statutory claims, or about the validity of defendants' claimed defense of sovereign immunity under the Eleventh Amendment.

As in other cases in which we have exercised our supervisory powers over district courts, we are confident that the district court will comply with this opinion and therefore we need not formally issue a writ of mandamus. *See In re Certain Special Counsel to the Boston & Maine Corp.,* 737 F.2d 115, 120 (1st Cir.1984); *In re Berkan,* 648 F.2d 1386, 1390–91 (1st Cir.1981); *In re United States,* 348 F.2d 624, 626 (1st Cir. 1965). In the unlikely event that this opinion is not complied with, defendants may petition for a writ of mandamus, in conformity with the procedures of Federal Rule of Appellate Procedure 21.

*So ordered.*