987 F.2d 1043
 Charles E. JOHNSON; Charles A. Hunter; Rodger W. Osborne;
Thomas L. Wells, Individually and On Behalf of All Others
Similarly Situated; Frank Domneys; George Brown; Ralph
Broadway, Plaintiffs-Appellees,
v.
Bishop L. ROBINSON, Secretary, Department of Public Safety
and Correctional Services; Richard A. Lanham, Commissioner,
Division of Correction; Paul J. Davis, Chairman, Maryland
Parole Commission; William L. Smith; Warden, Maryland
House of Correction; Lloyd Waters, Superintendent, Maryland
Correctional Institution--Hagerstown; Leronia A. Josey,
Former Maryland Parole Commissioner, Defendants-Appellants.
 No. 92-6231.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 26, 1992.
Decided Feb. 22, 1993.
 
 Carmen Mercedes Shepard, Asst. Atty. Gen., Baltimore, MD, argued (J. Joseph Curran, Jr., Atty. Gen., Richard H. Kestendieck and Stuart M. Nathan, Asst. Attys. Gen., on brief), for defendants-appellants.
 David Cyrus Fathi, Nat. Prison Project of the American Civ. Liberties Union, Washington, DC, argued (Adjoa A. Aiyetoro, Elizabeth Alexander, Nat. Prison Project of the American Civ. Liberties Union, Washington, DC, Ward B. Coe, III, Whiteford, Taylor & Preston, Baltimore, MD, on the brief), for plaintiffs-appellees.
 Before HALL, WILKINSON, and LUTTIG, Circuit Judges.
 OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 At issue here is an order entered by the district court pertaining to the Maryland system of corrections. The order specified a timetable within which Maryland prison officials must make eighty-three improvements at two prison facilities. Our review of the record indicates that the district court exceeded its authority in issuing this order. The parties never formally agreed upon the duties specified in the timetable, and these duties add substantially to those accepted by the prison officials in the original consent decree. Absent a proper modification of the consent decree, the district court had no authority to bind state prison officials to the timetable's terms. Accordingly, we reverse and remand the case with instructions to deny the plaintiff prisoner group's motion for further relief.
 
 I.
 
 2
 This appeal represents the latest round in an ongoing dispute that began in 1977 over conditions of confinement at the Maryland House of Correction ("MHC") and the Maryland Correctional Institution in Hagerstown ("MCI-H"). Prisoners at each of the facilities brought class action suits claiming that their conditions of confinement violated the Eighth Amendment. The suits were brought against the Secretary of the Maryland Department of Public Safety and Correctional Services and various other prison officials. This court consolidated the cases in 1981. Nelson v. Collins, 659 F.2d 420 (4th Cir.1981). The litigation has produced a series of judicial decrees, stipulations, and modifications since 1978, the most recent and relevant being a 1987 Stipulated Agreement approved by the district court.
 
 
 3
 The 1987 Agreement calls for prison officials to implement preventive maintenance plans and "immediately [to] correct and maintain in good condition all environmental deficiencies" at both facilities. The 1987 Agreement requires that prison officials do thirteen things: (1) repair or replace all broken windows; (2) repair all inoperable plumbing; (3) repair roof leaks and exposed electrical wiring; (4) eliminate all cross-connections; (5) maintain a clean, properly painted and plastered environment; (6) use properly maintained and operated equipment; (7) correct all fire safety deficiencies in accordance with the National Fire Protection Association Code; (8) insulate pipes properly; (9) provide twenty foot-candles of lighting in all living, work, academic, and library areas; (10) provide at least ten cubic feet of outside or recirculated air per minute per occupant during the summer; (11) use best efforts to maintain noise decibels at specified levels; (12) correct all public health, sanitation, and fire safety violations in punitive isolation units; and (13) provide laundry facilities at MCI-H. The 1987 Agreement also provides that the district court retains discretionary authority to modify the agreement, subject to the applicable law concerning modification; in addition, "[e]ither party may seek enforcement of the provisions of this agreement by appropriate motion."
 
 
 4
 The 1987 Agreement was reached at a time when the inmate population in the Maryland Division of Corrections (the "MDOC") was projected to reach 13,338 by 1995. Instead, the male population within MDOC reached 16,182 by July of 1991. The MDOC responded to this rapid population growth by opening a new facility in 1987, another in early 1989, and by funding and opening six other units in 1990 and 1991. Even while undertaking such expensive construction, the MDOC made substantial progress in improving MHC and MCI-H and complying with the 1987 Agreement. Prison officials provided a preventive maintenance plan, and made numerous repairs of windows, plumbing, roof leaks, equipment, pipe insulation, and laundry facilities. Officials also improved other aspects of the facilities as called for in the 1987 Agreement, including food service, health care, and program availability. MHC and MCI-H each have current operating budgets in excess of $35 million, an increase of over 50% since 1987.
 
 
 5
 Dissatisfied with the rate of progress being made at the two facilities, the inmate plaintiffs moved to have prison officials held in contempt on August 2, 1990, for allegedly violating several requirements of the 1987 Agreement. Specifically, the plaintiffs alleged that officials were not complying with provisions regarding fire safety and the housing of inmates in basement areas. This motion was never ruled upon. Instead, the parties again entered negotiations in the hope of reaching a settlement agreement as they had on prior occasions. These 1990 negotiations, however, never culminated in any sort of formal agreement.
 
 
 6
 During negotiations, the parties compiled a list of eighty-three repairs to be made at the two facilities. Prison officials provided a timetable of projected dates for completing the repairs. The officials anticipated that the completion of at least some items on the timetable would help to narrow the remaining areas of dispute. The officials further maintained that the timetable was developed with the understanding that its dates of completion were tentative and conditional at all times on obtaining needed funding. The timetable was submitted to the district court on several occasions, but only as part of a monthly status report on progress with respect to prison repairs. At no time did the prisoners or the prison officials submit the timetable to the court as part of a formal settlement agreement or proposed consent decree.
 
 
 7
 The timetable consists of both a list of repairs and a specific schedule for completing them. Several of the eighty-three specified improvements, as well as the completion schedule, go well beyond the general requirements of the 1987 Agreement. The 1987 Agreement provides for only twenty foot-candles of lighting in living, work, academic, and library areas. The timetable, by contrast, requires the installation of contractor-supplied, tamper-proof, fluorescent light fixtures throughout MHC. The timetable also provides for a complete electrical upgrade project at MCI-H, including improvement of the transformer distribution system and installation of a new emergency generator. Neither of these repairs is mentioned in the 1987 Agreement. In terms of specific electrical repairs, the 1987 Agreement calls only for the repair of all exposed wiring.
 
 
 8
 As for plumbing, the 1987 Agreement requires merely the repair of all inoperable plumbing. The timetable, however, calls for daily plumbing inspections and repairs, as well as for a complete plumbing upgrade project at MCI-H to renovate shower areas, and to replace supply lines, steam lines, and sewer lines. Similarly, the 1987 Agreement specifies only minimum requirements for outside or recirculated air between the months of May and October, but the timetable indicates that the prison officials will request $350,000 from the legislature for the design and installation of a "mechanical supply and exhaust ventilation system" for MCI-H.
 
 
 9
 In 1990 and 1991, prison officials made substantial progress in completing all of the eighty-three repairs. As of July 31, 1991, officials had completed sixty-nine of the eighty-three items (83%): the remaining repairs, however, included the large capital projects to upgrade lighting, plumbing, electrical, and ventilation systems. Progress on the repairs is continuing. Not all repairs at MHC and MCI-H were completed by the dates projected in the timetable, but officials have labored under at least two handicaps. First, MDOC has had to continue building new facilities to house an ever-growing inmate population. Second, an inmate uprising at MCI-H in May of 1991 damaged repairs that already had been made. Some work had to be redone, and joint projects at both facilities were delayed.
 
 
 10
 On June 7, 1991, the prisoners filed a motion for further relief. They specifically requested that the district court convert the timetable into a court order, so as to bind prison officials to the completion of all eighty-three repairs and upgrades by the projected dates. The prisoners also asked the district court to fine prison officials $1,000 a day for each day that the improvements were delayed, following a thirty-day grace period.
 
 
 11
 The district court heard oral argument on the motion on September 9, 1991. On September 19, the court issued a brief order granting in part and denying in part the motion. Specifically, the district court approved "the timetable agreed upon by" the parties, but denied the request for prospective, automatic sanctions. The language of the order itself barely covers half a page, and the district court made no specific findings of fact or conclusions of law. On January 27, 1992, the district court denied the defendants' motion to alter or amend the judgment. This appeal followed.
 
 II.
 
 12
 The threshold issue in this appeal is whether the parties actually "agreed" to the timetable for correctional improvements. The plaintiffs assert that prison officials agreed to making the eighty-three improvements in accordance with the timetable, and that the district court approved the timetable as it appeared in the monthly status reports. Therefore, the prisoners argue, the district court had the authority to order the prison officials to comply with the timetable in all of its particulars.
 
 
 13
 We think this view of the matter is misplaced. Even given their distinctive character as agreements backed by the authority of the court, consent decrees are to be interpreted as contracts. Willie M. v. Hunt, 657 F.2d 55, 59-60 (4th Cir.1981). The binding force of a consent decree comes from the agreement of the parties. Local Number 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 522, 106 S.Ct. 3063, 3075, 92 L.Ed.2d 405 (1986). A federal district court may not use its power of enforcing consent decrees to enlarge or diminish the duties on which the parties have agreed and which the court has approved. See United States v. Michigan, 940 F.2d 143, 159 (6th Cir.1991); United States v. Western Elec. Co., 894 F.2d 430, 435 (D.C.Cir.1990); Brewster v. Dukakis, 687 F.2d 495, 497 (1st Cir.1982).
 
 
 14
 We see no agreement between the parties that gave the district court authority to enter the order that it did. Maryland prison officials did not enter into a binding agreement with the prisoners to complete the eighty-three repairs in accordance with the timetable during the 1990 negotiations. The negotiations following the 1990 contempt motion rose, at most, to the level of an arrangement to work toward an agreement. See Ramirez v. Rivera-Dueno, 861 F.2d 328, 331 (1st Cir.1988) (holding that an agreement perceived by one party and the district court as a binding consent decree was no more than "an arrangement to work toward a mutually acceptable agreement"). The parties compiled the list of eighty-three repairs, and the prison officials drew up a timetable, as a part of the ongoing settlement discussions. A framework for settlement discussions and negotiations is not to be confused, however, with the execution of a binding agreement. The most basic axiom of contract law holds that an agreement is enforceable only if the parties have a meeting of the minds and all conditions precedent to agreement have been met. The record does not indicate that any such meeting of the minds occurred between these parties. The only evidence pertaining to the 1990 negotiations that was presented to the district court was a prison administrator's affidavit. The affidavit indicates that all parties understood throughout the negotiations that the prison officials' ability to comply with the projected dates on the timetable was contingent on funding--funding that has never been forthcoming to the Maryland Division of Corrections.[1]
 
 
 15
 In lieu of evidence of any binding agreement concerning the timetable, the prisoners have argued to the district court, and again before this court, that it is not their practice to enter into nonbinding agreements. Plaintiffs maintain that they abandoned pursuit of their 1990 contempt motion only because the officials promised to make repairs in accordance with the timetable. Defendants counter that the inmates suspended litigation of their 1990 contempt motion for the prospect of achieving significant upgrades at MHC and MCI-H that the officials were not required, but were willing, to undertake. See Ramirez, 861 F.2d at 332-33. We need not sort through all the accusations regarding tactical maneuvers, however, because the fact remains that no final agreement was reached. Plaintiffs were well aware of how to bind prison officials to an agreement if one had been reached. The process is one that is followed in institutional litigation throughout this country. See Special Project, The Remedial Process in Institutional Reform Litigation, 78 Colum.L.Rev. 784, 809-12 (1978). Indeed, the process was one that was followed in this case. The parties agreed to alter several decrees from the late 1970s with both a Stipulation in 1983 and the Agreement in 1987. Each time, the agreements were memorialized, signed by the parties, and then approved by the district court. Yet at no time in 1990 or 1991 did the parties memorialize, sign, or submit to the court any agreement about this timetable.[2]
 
 
 16
 A timetable developed by a party to aid ongoing settlement discussions is not automatically to be transformed into a binding decree. The elevation of the timetable to the status of a binding order may well skew incentives and hamper progress in future settlement discussions. By incorporating into an order material intended to assist negotiations, the district court risked disruption of a process of informal discussions between the parties through which considerable progress at MHC and MCI-H had been made. Under its approach, prison officials would be far better off eschewing future negotiations and holding out for a minimalist interpretation of the 1987 Agreement. As defendants put it, they "could do no worse by litigating each and every complaint" that plaintiffs raise. Moreover, under Fed.R.Evid. 408, the timetable would not be admissible as evidence because it was generated in the course of settlement negotiations. See Fiberglass Insulators, Inc. v. Dupuy, 856 F.2d 652, 654 (4th Cir.1988). We deem equally inadvisable the district court's adoption of this negotiating medium for use as a binding court decree.
 
 
 17
 Finally, we are not persuaded that the timetable must be elevated to a binding order merely because progress under it was dutifully communicated to the district court in monthly status reports. It is true that the reports were meticulous, apprising the court both of progress made and of work that remained to be done.[3] The parties gave no indication, however, that those status reports were submitted for court approval as a settlement to be incorporated as a part of the decree. Status reports that are never referred to on their face or in the court's docket as "settlement agreements" or "consent decrees" do not automatically become such when it suits one party's purposes. See Ramirez, 861 F.2d at 332 (emphasizing that a joint status report was not part of a settlement agreement when the report was not so labeled). A party must be able to apprise a district court of its actions in a given area without fear that every goal it strives to meet will become part of a decree. Of course, when the parties have presented documents to the court that reflect the content of an agreement, and the court has given official approval to those terms, the commitment is a binding one. See SEC v. Levine, 881 F.2d 1165, 1180 (2d Cir.1989). This did not happen here, however, and plaintiffs were not entitled to assume that the district court would enforce their expectations of expenditures when settlement by definition requires the assent of both negotiating parties. Ultimately, the question is whether a significant voluntary effort on the part of a state to improve its prison facilities inevitably becomes a set of federally supervised requirements. We hold that it does not, and that the terms of the timetable do not constitute an addendum to the earlier consent decree.
 
 III.
 
 18
 Because the terms of the timetable do not constitute an addendum to the consent decree, the 1987 Agreement continues to govern this case. The district court, of course, may interpret that Agreement and enter remedial orders enforcing its terms. Plaintiffs contend that, if the timetable is not viewed as a separate agreement, then the district court converted the timetable into this order to enforce immediate compliance with the 1987 Agreement. Plaintiffs maintain that the district court had this authority because defendants have been "continually out of compliance" with the 1987 decree.
 
 
 19
 In enforcing the 1987 Agreement, the district court has the authority to order the performance of duties contained within the "four corners" of the consent decree. Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 574, 104 S.Ct. 2576, 2585, 81 L.Ed.2d 483 (1984) (quoting United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)). We do not regard the instant order, however, as an example of enforcement, nor do we understand the district court to have regarded it as such. The court never indicated that this was a remedial order; indeed, it never established any need to enforce the 1987 Agreement, because the court never found Maryland officials not to be in compliance with that Agreement. The abbreviated order does not indicate how or even whether Maryland officials might be out of compliance, and even the plaintiff class did not originally seek compliance with the timetable as a means to enforce the 1987 Agreement. Rather, at oral argument on the motion, the inmates specified that they wanted the district court to do exactly what it did--treat the timetable as a new and binding agreement and enter it as an order.
 
 
 20
 The second obstacle to viewing the timetable as a simple remedial order is that it plainly imposes on prison officials obligations that far exceed the requirements of the 1987 Agreement. First, the timetable mandates a specific schedule within which the repairs must be completed. This forces prison officials immediately to allocate large sums of money so that they can complete significant capital upgrades within a very short time. Some of the deadlines for the expensive capital improvements, such as upgrading the electrical system at MCI-H, already have passed. Instead of being able to space out expenditures in relation to the availability of funds, officials may have to divert funds from other pressing public needs in order to comply with the order. Such a command would conflict with our understanding of a consent decree as a "future-oriented" plan designed to achieve "broad public policy objectives." Plyler v. Evatt, 924 F.2d 1321, 1324 (4th Cir.1991) (citations omitted).
 
 
 21
 Further, the timetable calls for a range and quality of improvements not contemplated in the 1987 Agreement. The Agreement calls only for general repairs in thirteen areas. The timetable mandates a broad range of eighty-three items that includes significant upgrades, not merely repairs, in lighting, electrical, plumbing, and ventilation systems. Where the 1987 Agreement calls for repairing inoperable plumbing, the timetable provides for new supply, steam, and sewer lines. Where the Agreement contemplates a minimum requirement for circulating air in the summer, the timetable provides a plan for a new mechanical supply and exhaust ventilation system. No one disputes the desirability of such improvements in a world of budgetary plenty; the issue is simply whether the 1987 Agreement obligates the prison officials to make them. We think the differences between the 1987 Agreement and the timetable are of such a magnitude that the latter cannot be enfolded into the former through the simple mechanism of enforcement.
 
 
 22
 The dissenting opinion, however, fails to perceive the differences to be so great and considers the district court's order nothing more than "a remedial measure aimed at enforcing the earlier 1987 order." Op. at 1053. The dissent insists that the timetable merely describes "how" the various repairs will be made, and that it imposes no burdens on Maryland prison officials beyond those agreed to in 1987. We believe, to the contrary, that judicially binding state officials to request funds and make extensive capital upgrades by specific dates involves far more than outlining "how" certain repairs will be undertaken. For example, the timetable not only provides for the "continuing process" of making specific repairs to inoperable plumbing, but also for upgrading MCI-H's entire plumbing system by installing new supply, steam, and sewer lines. While the repairs clearly were agreed to in 1987, the upgrades and new equipment were not. Similarly, the 1987 Agreement calls for only the most general of electrical repairs, such as repairing exposed electrical wiring, while the timetable calls for such large capital projects as the upgrade of the transformer distribution system and the purchase of a new emergency generator. Prison officials later suggested, and still hope to achieve, the upgrades in these and other areas, but nothing in the record indicates that the officials contemplated being ordered by the courts to complete them. We cannot wedge such multi-million dollar capital improvements into the confines of the 1987 Agreement under the guise of enforcement. As Director of Facilities Maintenance Chandler points out in his affidavit, the list of eighty-three improvements in the timetable "was not limited by the specific terms of the Stipulated Agreement." Yet the dissent's position would impose upon state officials expensive obligations to which they have never agreed.
 
 
 23
 While a district court may, of course, modify a consent decree to impose new duties upon a party, see Rufo v. Inmates of Suffolk County Jail, --- U.S. ----, ---- - ----, 112 S.Ct. 748, 757-58, 116 L.Ed.2d 867 (1992), the basic procedures for modification were not pursued at the trial level. Neither party submitted a Fed.R.Civ.P. 60(b) motion seeking relief from the 1987 Agreement. To modify a consent decree to impose new obligations, a district court must at a minimum (1) provide specific notice that it is contemplating the imposition of obligations in addition to those contained in the decree; (2) allow the parties an opportunity to present relevant evidence on the need for the additional obligations and the proper character of those obligations; and (3) issue specific findings that support a determination that modification is warranted. See United States v. Western Elec. Co., 894 F.2d 430, 435 & 437 n. 12 (D.C.Cir.1990). The procedures necessary to support any modification of the 1987 Agreement were not followed in this case.
 
 
 24
 Defendants urge us to hold that plaintiffs cannot carry their burden to support a modification in any event. Because of the progress made at the facilities in the face of both a growing inmate population and the difficulties created by the 1991 prisoner disturbance, defendants contend that any modification of the 1987 Agreement should lessen, rather than stiffen, their obligations. See Rufo, --- U.S. at ----, 112 S.Ct. at 760. Officials also argue that a timetable mandating eighty-three repairs when at most fourteen repairs remain to be made is not suitably tailored to any changed circumstances. Id. --- U.S. at ----, 112 S.Ct. at 763.
 
 
 25
 Because neither party has properly moved for modification, the issue is not before this court or ripe for us to decide. We make only the settled observation that any modification of the 1987 Agreement must heed the Supreme Court's admonition that federal courts respect the role of states in the administration of their correctional systems. Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979); see also Plyler, 924 F.2d at 1324. This deference extends not only to internal security concerns, but also to the comprehensive planning and commitment of resources that are "peculiarly within the province of the legislative and executive branches of government." Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); see also Thornburgh v. Abbott, 490 U.S. 401, 407-08, 109 S.Ct. 1874, 1878-79, 104 L.Ed.2d 459 (1989). The Supreme Court has recently emphasized that such deference is appropriate when modifying consent decrees in institutional reform litigation, and that any decision on modification should take into account the greater public interest and the "legitimate concern" of state "financial constraints." Rufo, --- U.S. at ----, 112 S.Ct. at 764.
 
 IV.
 
 26
 We recognize that the process of administering a consent decree often taxes the patience of all who are involved with it. Plaintiffs almost invariably believe that progress is neither prompt nor complete, and defendants are often vexed by seemingly endless demands for more expenditures. The monitoring process for district courts is likely to be a difficult one. Fortunately, the instant case is one where progress has been and will continue to be made. The authority of law, however, was not properly invoked to impose upon Maryland officials the particular timetable which plaintiffs seek in this case. For the reasons stated above, we must reverse the judgment of the district court and remand this case with instructions to deny plaintiffs' June 1991 motion for further relief.
 
 
 27
 REVERSED AND REMANDED WITH INSTRUCTIONS.
 
 K.K. HALL, Circuit Judge, dissenting:
 
 28
 My disagreement with the majority stems from our differing views regarding what the order on appeal actually does. The timetable does not "go well beyond the general requirements of the 1987 Agreement." Op. at 1045. The defendants concede that "[t]he parties' expectation was that when the 83 items were corrected, the parties would agree that the institutions were in compliance with the 1987 Agreement's provision." Appellant's brief 9. In "approving" the timetable, the district court did no more than recognize that the specific corrective actions agreed upon by the parties were an adequate response to the agreement reached four years earlier.
 
 I.
 
 29
 In opposing the inmates' motion below, the defendants contended that the timetable "vastly expand[ed] the scope of the [1987] Stipulated Agreement." In neither their pleadings below nor their brief to this court, however, did the defendants explain how their obligations are expanded. The majority, however, gives four examples of this purported expansion. See op. 1046, 1049. A detailed examination of each example refutes this threshold premise of the majority's opinion.
 
 A.
 
 30
 The majority contrasts the 1987 Agreement's requirement of "only twenty foot-candles of lighting in living, work, academic, and library areas" with the 1990 timetable's "require[ment of] the installation of contractor-supplied, tamper-proof, fluorescent light fixtures throughout MHC." Op. 1045. In the six-column timetable itself, the first column ("DEFICIENCY") reads: "Correction of the lighting by fluorescent fixtures (this is what we agreed at the meeting)." After years of waiting for "twenty foot-candles of lighting in all living, work, academic, and library" (which is pretty much the same as saying "throughout the prison"), the parties simply specified how this deficiency was to be corrected. The timetable does not require "contractor-supplied tamper-proof" fixtures; column six of the timetable ("Status as of 15 December 1990") contains the following note: "Installation of Fluorescent fixtures Started by In-house staff. Prototype selected after several test[s] to insure tamper proof enclosures." The requirement is still to provide adequate lighting. In 1987, the requirement was "20 foot-candles"; some years later, the parties agreed (at least with regard to one prison) to install fluorescent lighting. That a contractor is supplying tamper-proof fixtures merely describes how the defendants have chosen to correct the lighting deficiency.
 
 B.
 
 31
 The second example of the purported "radical expansion" of obligations is the timetable's provision for "a complete electrical upgrade project at MCI-H, including improvement of the transformer distribution system and installation of a new emergency generator." Op. 1045. Again, the language of the timetable itself paints a different picture. The related deficiency listed in column one is "[r]epair of overloaded electrical outlets." This deficiency is clearly within the ambit of the following requirement of the 1987 Agreement (which was subject to immediate correction): "7. The correction of all fire safety deficiencies outlined by the State Fire Marshal. The defendants shall comply with the requirements of the NFPA Code for correctional institutions adopted by the Maryland Department of Public Safety and Correctional Services." The third column of the timetable ("CORRECTIVE ACTION REQUIRED") notes that "Phase II of an electrical upgrade project will correct these deficiencies at MCI-H ... Phase I is design, including upgrade of the transformer distribution system and purchase of new emergency generator needed to implement phase II. Phase II is construction of phase I items, ... contingent upon funding approval."[1] I am unable to see how this imposes any new obligations on the defendants. In 1987, they agreed to immediately correct all fire safety deficiencies, and "overloaded electrical outlets" certainly qualifies as a fire safety deficiency. How the defendants intend to go about correcting this aspect of the overall fire-safety problem does not expand the state's obligations.
 
 C.
 
 32
 As for plumbing, the 1987 Agreement requires the defendants to "repair all inoperable plumbing." In the "DEFICIENCY" column in the MHC section of the timetable is the following: "Repair of inoperable plumbing in the main institution." Under "CORRECTIVE ACTION REQUIRED," the report reads: "Daily plumbing inspection logs are made. Deficiencies from these logs are required [sic] as soon as possible. This is a continuing process. A plumbing upgrade project to replace supply lines, steam lines, sewer lines and renovate shower areas, will be submitted in the FY 93 capital request." The "COMPLIANCE SCHEDULE" column reads: "Phase I (Design) contingent upon approval of funding, would be awarded 1/92. Completion would occur 2/93. If Funding is Approved, a Design Award, could be made by 12/91." Again, the deficiency addressed in the timetable is no broader than the express terms of the 1987 Agreement: repair inoperable plumbing. The timetable merely establishes what plumbing needs to be repaired and how (again, contingent on funding) the defendants hope to remedy the problem.
 
 D.
 
 33
 Finally, the majority contrasts the 1987 Agreement's specification of minimum air circulation requirements for 5 1/2 months of the year[2] with the timetable's provision that the defendants would seek funding for a $350,000 ventilation system at MCI-H. The precise wording of the deficiency listed in the timetable is as follows: "Development of a system (however to be done) to take care of the air exchange requirements in the main institution [at MCI-H]." As with the planned electrical and plumbing upgrades, the chosen "corrective action" is made "contingent upon funding approval." The "air exchange requirements" are no doubt those established by the specific terms of the 1987 Agreement. The parenthetical phrase "(however to be done)" suggests that the defendants decided that a $350,000 ventilation project was the way to go to meet the requirements.
 
 II.
 
 34
 The majority's fears that the timetable would "mandate[ ] a specific schedule within which the repairs must be completed" and that "officials may have to divert funds from other pressing needs in order to comply with the order" are simply overstated. Op. 1049. Under the "CORRECTIVE ACTION REQUIRED" column, the matter of funding takes one of three basic forms: (1) no funding needed, e.g. work to be done by in-house maintenance staff (approximately 45-50 items; see n. 3, infra); (2) funding has been or will be requested (approximately 5-10 items); and (3) funds have been earmarked already in the then-current budget (which was the FY 1992 budget under the December 15, 1991 timetable that was "approved" by the court) (approximately 25-30 items).
 
 
 35
 According to the appellants, only 14 items remain uncompleted. I assume that these comprise (1) items that are presently incomplete but for which funding is available, and (2) items for which funding has been requested but has not been approved. I do not interpret the timetable to require diversion of funds to the latter group. The timetable includes what needs to be done, how such work is to be accomplished, and where the money to do it is to come from. The "contingent-on-funding" disclaimers were not added unilaterally by the defendants; they are integral parts of the timetable agreement. If funding is requested but not received, I cannot imagine that contempt would lie.
 
 III.
 
 36
 Building from the premise that the timetable vastly expanded the defendants' duties, the majority characterizes the timetable as "[a] framework for settlement discussions and negotiations" rather than a binding agreement. Op. 1047. As I have explained above, the timetable does not expand the obligations of the 1987 Agreement; it is, rather, "a detailed implementation plan designed to eliminate possible sources of continued non-compliance...." Class v. Norton, 505 F.2d 123, 125 (2d Cir.1973). Once the scope of the timetable is seen in this light, I find it readily apparent that the court's approval order is primarily a remedial measure aimed at enforcing the earlier 1987 order. There should be no question that the defendants "agreed" to the provisions in the timetable, at least in the sense that they believed that the deficiencies listed needed to be corrected and that the corrective actions listed were the best means available. The question posed by the majority, however, is whether or not the defendants agreed to have this timetable agreement made an order of the court. See op. 1046 ("We see no agreement between the parties that gave the district court authority to enter the order that it did.") The district court, however, only needed such conferred authority to modify the 1987 Agreement. As it is, the court's approval order merely enforces what had been in effect for some four years.
 
 IV.
 
 37
 "In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow.... Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." Lemon v. Kurtzman, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973) (citation and footnote omitted). The court-approved timetable is such a blend.
 
 
 38
 This case was filed in 1977. Ten years later, the parties agreed on rather broadly worded goals to bring the prison up to constitutional standards. In 1990, after three years of waiting on the "immediate correction" of "all environmental deficiencies," the inmates decided to press the issue and request that the defendants be held in contempt. The defendants then sat down with the inmates and hammered out an 83-item[3] list of deficiencies, specific corrective action, and a schedule for completion. The broad but somewhat amorphous goals of 1987 took on a workable form, and a possible contempt finding was forestalled. Most corrective actions, particularly those requiring large expenditures of state funds, are made contingent on funding approval. Because I do not see how the timetable does anything more than state how and when the defendants intend to meet the obligations that they assumed (by agreement reduced to court order) in 1987, I believe that the timetable does not "modify" the 1987 Agreement.
 
 
 39
 I would affirm the district court.
 
 
 40
 In his uncontested affidavit, Charles Chandler, Director of Facilities Maintenance for the Maryland Department of Public Safety and Correctional Services, states, "I made it very clear, and I believed all parties understood, that our ability to address many of the concerns would depend on funding. Obviously funding and the performance by contractors will have major impacts in determining the actual date of completion of some corrective action."
 
 
 
 [2]
 Plaintiffs make much of the defendants' use of the word "agreed" in this sentence from their brief: "Rather than expend resources in litigation or extensive negotiations leading to modification of the 1987 Agreement, the prisoners' experts and DOC officials identified a list of items at MHC and MCI-H for which improvements were desirable or necessary and which the State agreed to undertake." When the sentence is read in context, it is clear that the defendants meant that they would try to complete the improvements, not that they considered themselves legally bound to do so. The paragraph in defendants' brief goes on to point out that settlement discussions remained "ongoing," that negotiations "were never formalized," and that any projected dates "were never intended to be binding."
 
 
 [3]
 For example, one timetable entry reads:
 Deficiency: Repair of overloaded electrical outlets.
 Corrective Action Required: Phase II of an electrical upgrade project will correct these deficiencies at MCI-H. Phase II (FY 92 Fund Request) is scheduled to be awarded 1/92. Phase I is design, including upgrade of the transformer distribution system and purchase of new emergency generator needed to implement phase II. Phase II is construction of phase I items and installation of outlets and new lighting, contingent upon funding approval.
 Compliance Schedule: Design Phase I starts, 1/91. Scheduled completion, 9/91. Phase II scheduled to start 1/92, contingent upon approval of FY 92 capital funding.
 Status As of 30 July 1991: Phase I design in progress. Phase II design funding approved. Cost of this project may increase and design and construction delayed because of damage and uncertainties from May 1991 inmate uprising.
 The May 15, 1991, timetable report notes as follows: "Phase I to start 4/91. Completion by 12/91. Phase II design funds approved in FY 92 budget. Phase I construction to start after 1/92."
 
 
 [2]
 The 1987 Agreement also required that the "defendants shall investigate other methods for increasing the air movement [to certain levels] ... submit a plan to the Court by September 1, 1987." I am unable to determine from the record whether such a plan was ever submitted
 
 
 [3]
 Eighty-three items is not as daunting as it sounds. By my count, more than half of the items were to be completed by "in-house maintenance staff," with no expenditure of funds noted, e.g. cutting and capping all dead electrical wiring in living areas; conduct monthly fire drills with inmate participation. Another 25-30 items had (as early as December, 1990) funds earmarked. Funding appeared to be a problem with fewer than ten items, albeit most of the major ones